**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harvey Gene LOVE, Jr. and Earline
Robin Sweda, Defendants-
Appellants.**

**No. 72–1453.**

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1973.

Herschel C. Adcock, Baton Rouge, La., for Earline Robin Sweda.

James L. Dendy, Jr., Baton Rouge, La. (Court appointed), for Harvey Gene Love, Jr.

Gerald J. Gallinghouse, U. S. Atty., Stephen L. Dunne, Mary Cazalas, Asst. U. S. Attys., New Orleans, La., for the United States.

Before RIVES, WISDOM and RONEY, Circuit Judges.

RIVES, Circuit Judge:

A two-count indictment was returned against Harvey Gene Love, Jr., Earline Robin Sweda, and James Clark Bateman. The first count charged that the three accused,

> "with intent to defraud, did unlawfully and knowingly possess one hundred and fifty-four (154) counterfeited * * * Federal Reserve Notes * * * each bearing the face value of twenty dollars ($20.00), * * * knowing the same notes to be * * * counterfeited; all in violation of Title 18 of the United States Code, Sections 472 and 2." [1]

The second count charged against Bateman alone a like offense for the possession of two (2) counterfeit twenty dollar ($20.00) Federal Reserve Notes. The jury found Bateman not guilty on either count, and both Love and Sweda guilty as to Count One. The district court sentenced Love to be imprisoned for twelve (12) years and Sweda for three (3) years. On appeal, Love and Sweda each insist that the one hundred fifty-four (154) counterfeit twenty dollar ($20.00) Federal Reserve Notes were the fruits of an unreasonable search and seizure violative of the Fourth Amendment and should have been suppressed as evidence. Upon the present record, we have no doubt that the search and seizure were constitutionally invalid and that Sweda's conviction must be reversed. Absent additional evidence, it is equally clear that

1. "§ 472. *Uttering counterfeit obligations or securities*

"Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

"§ 2. *Principals*

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

Love's constitutional rights were violated by the search and seizure. Whether Love's right to relief on appeal has been preserved, however, presents a difficult question.[2] We conclude that that question also must be decided in favor of Love.[3] Each of the questions requires a detailed and careful study of the evidence.

*The Evidence*

Sergeant George O'Connor of the East Baton Rouge, Louisiana, Sheriff's Office was the first officer to acquire any information about the counterfeit Federal Reserve Notes. Sergeant O'Connor's information came from a local confidential informant whose identity he refused to disclose, but whom he had used before. O'Connor failed either to describe his informant as reliable or credible or to give any basis for such a conclusion. On the hearing of Sweda's motion to suppress, several officers of the East Baton Rouge Sheriff's Office testified. To be exact, we quote pertinent parts of their testimony at length in Appendix "A" to this opinion.

At the close of the evidence on Sweda's motion to suppress, the district judge stated his reasons for denying the motion, which we quote in Appendix "B" to this opinion.

Deputy Sheriff Torrence who seized the counterfeit Federal Reserve Notes from Sweda's purse did not testify on the motion to suppress but did testify for the Government at the trial as follows:

"BY MR. DUNNE [Assistant U. S. Attorney]:

"Q. Now, did you take the contents out of the purse, or did Miss Sweda take the contents out of the purse?

"A. She did.

"Q. What transpired? Without me asking you questions—First will you tell us what transpired in that room on that evening, for this court?

"A. Well, after a series of event [sic] then, Sergeant O'Connor requested she remove everything from her purse; at which time she did.

"Q. Did she object in any way?

"A. No, sir. And upon emptying the purse, she took it and she turned it upside down, and as I recall stated 'I was emptying the tobacco out of

2. Under Rule 41(e), F.R.Cr.P.,
   "(e) Motion for Return of Property and to Suppress Evidence. A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for the use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued or (5) the warrant was illegally executed. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial. The motion to suppress evidence may also be made in the district where the trial is to be had. The motion shall be made before

trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing."

3. In his brief on appeal Love also contends that the district court erred in denying his motion for judgment of acquittal. That motion has no basis whatever, if we hold that as to him the counterfeit notes should not be suppressed. At the trial Special Agent Copeland of the U.S. Secret Service testified to incriminating statements made by Love and Sweda. (Bateman denied any knowledge of the counterfeit notes.) Further at trial, two witnesses, Edward North and Tom Ray, testified that they had had previous dealings about counterfeit money with Love in the presence of Sweda. (No similar evidence was introduced against Bateman.) If we hold that the counterfeit notes should be suppressed as against Love, then, as we discuss later, it would appear that Love's motion for judgment of acquittal should have been granted.

it.' The loose tobacco. Upon completing this, I asked her if I could see the purse; and she handed it to me and that's when I looked inside and found the cellophane package containing the money.

"Q. All right. Now, what was contained in the cellophane package?

"A. The money.

"MR. KENNON [Attorney for Bateman]:

Your Honor, I would like to object at this point on behalf of my client to any evidence seized in connection with this case for the reasons set forth in the Motion to Suppress, which the Court has heard.

"THE COURT: Well, the Court has already overruled the Motion to Suppress. So the motion is overruled. The objection is overruled." [Vol. III, Rec. pp. 37, 38] [4]

Love's counsel did not separately move to suppress the one hundred fifty-four (154) counterfeit twenty dollar ($20.00) Federal Reserve Notes removed from Sweda's purse, nor did he formally object to their introduction in evidence.

The Government's theory throughout the prosecution was that Sweda's possession of the one hundred fifty-four (154) counterfeit twenty dollar ($20.00) Federal Reserve Notes was a possession on behalf of herself and of Love and Bateman. Count One of the indictment indicates that theory by its description of the Federal Reserve Notes and by its express reference to Title 18, Section 2 of the United States Code. Government counsel in his opening argument to the jury explained:

"As to Count One, we have all three defendants charged with possession of these bills. As the judge will instruct you, there are two types of possession, actual and constructive possession.

Let me use this pen as an example: If I hold this pen in my hand, I have actual possession of it; but if I place it on the table there and come back to this podium, I'm not in actual possession of it, but it's in my constructive possession, because I can get it any time I want.

"The same reasoning applies in this case here.

"There is no doubt in your minds, I'm sure, that the bills were in Miss Sweda's purse when they were apprehended, 154 of them. All right. Now, she was flanked by two male individuals traveling at a high rate of speed, allegedly going to a neighboring state. We also have the admission of Harvey Love; he claimed these bills were his. Is there any doubt in your mind that he possessed these bills? He could get them at any time he wanted. As a matter of fact, no less than 154 people could have possessed these bills, each one taking a bill. So it's easily conceivable that all three of these individuals could have possessed these bills, could have exercised some control or dominion over them, could have dipped into that purse at any time and taken one out at a gas station or a restaurant and passed one during the course of the travels." [Vol. III Rec. pp. 128, 129.]

The same theory was reiterated in the closing argument of Government counsel. [Vol. III Rec. pp. 166, 167.]

### Sweda's Appeal

Our lengthy reproduction of so much of the pertinent evidence introduced on Sweda's motion to suppress (see Appendix "A" to this opinion) simplifies our task of applying the law to the facts.

■ The seizure of the Federal Reserve Notes from Sweda's purse was not

---

4. In overruling Bateman's objection first made at the trial, the district court ruled on the merits of the illegal seizure issue, and thus that issue was preserved for review on any appeal by Bateman. Giacona v. United States, 5 Cir. 1958, 257 F.2d 450, cert. denied, 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104; other cases cited in 3 Wright, Federal Practice & Procedure § 678, n. 40. An additional objection by Love would have been a useless formality, as we shall later discuss.

authorized by any warrant, whether search warrant or warrant of arrest. That fact mandates a strict standard of review.

"The Fourth Amendment forbids every search that is unreasonable and is construed liberally to safeguard the right of privacy. Byars v. United States, 273 U.S. 28, 32, [47 S.Ct. 248, 71 L.Ed. 520]. Its protection extends to offenders as well as to the law abiding. Weeks v. United States, 232 U.S. 383, [34 S.Ct. 341, 58 L.Ed. 652]. Agnello v. United States, 269 U.S. 20, 32, [46 S.Ct. 4, 70 L.Ed. 145]. The authority of officers to search one's house or place of business contemporaneously with his lawful arrest therein upon a valid warrant of arrest certainly is not greater than that conferred by a search warrant issued upon adequate proof and sufficiently describing the premises and the things sought to be obtained. Indeed, the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests. Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime. United States v. Kirschenblatt, [2 Cir.] 16 F.2d 202, 203. Go-Bart Co. v. United States, *supra* [282 U.S. 344], 358 [51 S.Ct. 153, 75 L.Ed. 374]."

United States v. Lefkowitz, 1932, 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877.

"An evaluation of the constitutionality of a search warrant should begin with the rule that 'the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . who may happen to make arrests.'

United States v. Lefkowitz, 285 U.S. 452, 464 [52 S.Ct. 420, 423, 76 L.Ed. 877]: The reasons for this rule go to the foundations of the Fourth Amendment. A contrary rule 'that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.' Johnson v. United States, 333 U.S. 10, 14 [68 S.Ct. 367, 369, 92 L.Ed. 436]. Under such a rule 'resort to [warrants] would ultimately be discouraged.' Jones v. United States, 362 U.S. 257, 270, [80 S.Ct. 725, 736, 4 L.Ed.2d 697]. Thus, when a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' ibid., and will sustain the judicial determination so long as 'there was substantial basis for [the magistrate] to conclude that narcotics were probably present . . . .' *Id.*, [362 U.S.] at 271 [80 S.Ct. at 736]."

Aguilar v. Texas, 1964, 378 U.S. 108, 110, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723.

No contention has been made that Sweda was lawfully arrested for speeding. Love was the driver of the automobile and there was no indication that Sweda aided or abetted that conduct. See 18 U.S.C. § 2, quoted in n. 1, *supra.*

▪ Actually, the evidence makes inescapable the conclusion that all three defendants were arrested for counterfeiting or upon suspicion of counterfeiting. The district judge stated his belief that there was probable cause to believe that Bateman "was wanted for counterfeiting and probably was engaged in or connected with counterfeiting in one way or another." (See Appendix "B" to

this opinion.) The district judge acted under the mistaken belief, upon the present record, "that whatever the source was, it had been used before and had proved reliable." (Appendix "B.") We find no such evidence in the record, not even the officer's bare conclusion that the source "had proved reliable." If that much did appear, it would not be sufficient.

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, Jones v. United States, 362 U.S. 257, [80 S.Ct. 725, 4 L.Ed.2d 697], the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, [84 S.Ct. 825, 11 L.Ed.2d 887], was 'credible' or his information 'reliable.' Otherwise, 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime,' Giordenello v. United States, *supra* [357 U.S. 480], at 486, [78 S.Ct. at 1250]; Johnson v. United States, *supra* [333 U.S. 10], at 14, [68 S.Ct. at 369], or, as in this case, by an unidentified informant."

Aguilar v. Texas, *supra*, 378 U.S. at 114, 115, 84 S.Ct. at 1514. See also Terry v. Ohio, 1968, 392 U.S. 1, 21, n. 18, 88 S.Ct. 1868, 20 L.Ed.2d 889.

Since there thus appears no probable cause to detain Bateman for counterfeiting, we need not explore the questionable validity of the further holding that from such probable cause there flowed probable cause to detain the other two occupants of the car. (See Appendix "B".)

■ Finally, the district judge found that Sweda's arrest came after receipt of the information from Dallas that the occupants of the automobile were wanted as fugitives from justice, and

"there was probable cause to detain and to arrest defendant Sweda on the grounds of being a fugitive, then I conclude that the search, if we can consider it a search, was incident to a lawful arrest and the proceeds of the search are competent—constitute competent evidence."

(Appendix "B".) Again, upon the present record, we must hold the district court's finding of fact clearly erroneous.[5] The information which Captain Clemmons received from Texas came from a Deputy Sheriff in McKinney, Texas, and was to the effect that the yellow Chevrolet in which the three defendants were traveling at the time of their arrest belonged to Bill Salmon who was in custody in Panama City, Florida, on a counterfeiting charge; and that this car and its occupants were wanted by the Secret Service out of Dallas. (App. "A" to this opinion.) There was no evidence either that any warrant had been issued to arrest the occupants of the car as fugitives from justice, or that any officer in any state, Florida, Texas or Louisiana, had "reliable" information from a "credible" source that Sweda or any other occupant of the automobile was a fugitive from justice. Some such evidence is indispensable to justify Sweda's arrest as a fugitive from justice. See United States v. Lefkowitz, *supra;* Aguilar v. Texas, *supra;* Terry v. Ohio, *supra.*

For the reasons stated, we hold that insofar as Sweda is concerned the present record does not justify the search and seizure from her purse, and that her judgment of conviction must be reversed.

---

5. We forego examining the validity of the conclusion that such an arrest would have the effect of making the Federal Reserve Notes admissible in evidence. See Chimel v. California, 1969, 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685.

## Love's Appeal

Love's counsel would have been well advised to move to suppress the one hundred fifty-four counterfeit Federal Reserve Notes, as did Sweda, or, failing that, to object to the introduction of the notes at the trial, as did Bateman; but he did neither. Love must therefore overcome the usual rule that, having failed to make any objection below, he has not preserved the issue for review on appeal. United States v. Beigel, 2 Cir. 1967, 370 F.2d 751, 756. Nonetheless we are constrained to hold that, under the peculiar circumstances of this case, that issue should be reviewed upon this appeal.

Clearly, Love's counsel did not intend to waive any constitutional right possessed by his client. Instead, he was laboring under the view expressed on page 2 of his brief on appeal.[6]

■■ It is true that suppression can be successfully urged only by one whose rights were violated by the search. Alderman v. United States, 1967, 394 U.S. 165, 171, 172, 173, 89 S.Ct. 961, 22 L. Ed.2d 176. Otherwise expressed, rights secured by the Fourth Amendment are personal rights which may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure. Simmons v. United States, 1968, 390 U. S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247. But Love meets this test. His rights were violated by Sweda's search and by the seizure of the counterfeit Federal Reserve Notes from her purse. Love's protection was infringed by the search and seizure.

Love was found guilty under the first count of the complaint which charged Love with the *possession* of the counterfeit Federal Reserve Notes. (See opening paragraph of this opinion.) In Jones v. United States, 1960, 362 U.S. 257, 264, 80 S.Ct. 725, 732, 4 L.Ed.2d 697, the Court stated as an alternative holding that it would be "squarely contradictory assertions of power by the Government" to indict a defendant for possession of contraband, while simultaneously asserting that he lacked the possession necessary to confer standing to object to an unlawful search and consequent seizure of the contraband. 362 U.S. at 263, 264, 80 S.Ct. 725, 4 L.Ed.2d 697. Approved in Simmons v. United States, 1968, 390 U.S. 377, 390, 88 S.Ct. 967, 19 L.Ed.2d 1247.

There may be merit in the view that by motion for a judgment of acquittal, valid only if the counterfeit notes were suppressed (see n. 2, *supra*), Love's counsel has preserved the question of the illegal search and seizure for appellate review. Or it may be that he rightly assumed that he could rely upon Sweda's motion to suppress, because, as the closing part of our statement in this opinion of the evidence demonstrates, the Government has proceeded throughout, from indictment to conviction, upon the theory that Sweda's possession of the counterfeit Federal Reserve Notes was a possession on behalf of herself and of Love and Bateman.

■ In any event, we are loath to visit upon Love the good faith but mistaken view of standing by his counsel. That would result in a gross miscarriage of justice. We hold that the failure of Love's counsel to move to suppress the evidence or to object to its introduction should be excused because such a motion or objection would have been a useless formality. (See n. 4, supra, and the adjunct text.) See also United States v. Lefkowitz, *supra*, 284 F.2d at 313 n. 1.

■ Furthermore, we think it clear from the record that plain error was committed in denying Sweda's motion to

---

6. "A motion to Suppress was not perfected individually on behalf of this appellant, Love, inasmuch as no physical evidence was found in his possession at the time of the warrantless arrest, and since he did not have actual or constructive possession of any counterfeit bills, he was without standing to perfect such a motion."

suppress. If the counterfeit Federal Reserve Notes had been returned to Sweda, they would not have been available for use at the trial. See McDonald v. United States, 1948, 335 U.S. 451, 456, 69 S. Ct. 191, 93 L.Ed. 153; F.R.Cr.P. 52(b); 3 Wright, Federal Practice & Procedure § 856.

> "Even without either a pretrial motion or an objection at the trial, the appellate court may consider whether evidence was illegally obtained if it is clear from the record that plain error was committed.[41]
>
> "[41]. *Plain Error*
> "U.S. v. Nikrasch, C.A.7th, 1966, 367 F.2d 740, 743, 744.
> "Where record showed plain error in admitting testimony gained as result of illegal search and seizure, conviction was reversed notwithstanding that defendant made no motion to suppress such evidence and failed to call attention to circumstances of the search and seizure until after he had been adjudged guilty. U. S. v. Asendio, C.A.3d, 1948, 171 F.2d 122, 124–125."

3 Wright, § 678 n. 41.

█ There remains for consideration the extent of relief to which Sweda and Love are entitled. The judgment of conviction of each should be reversed. Should their cases be remanded for a new trial or should the district court be directed to enter judgments of acquittal? All of the evidence which resulted in the convictions of Sweda and Love flowed from the fruits of the illegal search and seizure. Assuming arguendo that a retrial of one or both is permissible under Rule 29(a), F.R.Cr.P. as last amended, and would not result in double jeopardy[7] in the light of the fact that the Government has had full opportunity to sustain the validity of the search and seizure and does not claim the discovery of any new evidence, we think that the interests of justice are best served[8] by directing a judgment of acquittal as to Sweda and Love. It is so ordered.

Reversed with directions.

7. See Bryan v. United States, 1950, 338 U.S. 552, 560, 70 S.Ct. 317, 94 L.Ed. 335; United States v. Parks, 5 Cir. 1972, 460

F.2d 736, 746; 2 Wright, Federal Practice & Procedure, § 470.

8. See 28 U.S.C. § 2106.

## APPENDIX "A"

*Pertinent Testimony on Hearing of Sweda's Motion to Suppress*

*Sergeant O'Connor*

On initial examination by counsel for Sweda, Mr. Adcock:

"Q. Now, will you explain to the Court how the apprehension of Miss Sweda occurred and what transpired?

"A. Well, I had received information from a confidential informant.

"Q. Had you used the confidential informant before?

"A. Yes, sir.

"Q. Was it a local confidential informant?

"A. Yes, sir.

"Q. Go ahead.

"A. And received information in regard to a subject who had counterfeit money in his possession.

"Q. A subject? Now, who was the subject?

"A. James Bateman.

"Q. Proceed.

"A. And I relayed this information on to Major Sliman; and he in turn took it from there. Later on that evening, Sergeant Tycer of the sheriff's office, stopped a vehicle which contained James Bateman, Earline Sweda, and Harvey Love.

"Q. But it's your testimony that this informant told you that James Bateman had the counterfeit money, is that correct?

"A. Yes, sir.

"Q. Earline Sweda was not suspected at this time of having counterfeit money from your informant?

"A. That's correct, yes, sir.

"Q. Proceed.

"A. So at which time they were brought to the Parish Courthouse and Earline Sweda and myself and

Sergeant—correction, Deputy Torrence and Deputy Levy took her back to the juvenile office and I asked her for some identification. She gave some identification, at which time she requested to use the restroom, at which time I obtained a matron for her, the matron took her to the restroom and brought her back.

"Q. Go ahead. At this time, what was Earline Sweda being held for?

"A. What was she being held for? What she was being detained for? With reference to possible possession of counterfeit money.

"Q. Now, on what did you base this suspicion that she was being held for counterfeit money on?

"A. James Bateman also being in the vehicle.

"Q. And from the fact that James Bateman was in her presence you assumed that she may have counterfeit money also; and was being detained for this purpose?

"A. Yes, sir.

"Q. Go ahead.

"A. At this time, I left and Captain Clemmons then advised me that Earline Sweda—correction—Captain Clemmons then advised me that the occupants of this vehicle was wanted in Dallas, Texas.

"Q. Now, this was the first time you knew the occupants were wanted in Dallas, Texas?

"A. Yes, sir.

"Q. At the time of the apprehension, the only cause for stopping Earline Robin Sweda was because she was in the presence of James Bateman, is that correct?

"A. She was in the vehicle with him.

"Q. Go ahead.

"A. At this time I went back and I advised Earline Sweda of her rights, which she stated she fully understood; she signed the rights form, at which time I told her to empty her purse, and at this time Deputy Torrence reached into her purse and removed a large amount of money that was wrapped up in a white handkerchief in a plastic bag with a snap on it.

"Q. Approximately how long had Earline Sweda been in your presence since the arrest up until the time Deputy Torrence went into her purse?

"A. About twenty-five minutes, on and off.

"Q. Is this twenty-five minutes from the time they were apprehended?

"A. No sir, from the time they were brought to the courthouse.

\* \* \* \* \* \*

"Q. What were you looking for, Deputy O'Connor?

"A. Counterfeit money, sir.

"Q. Counterfeit money?

"A. Yes, sir.

"Q. That was the reason for going into her purse?

"A. No, sir. She was detained. Actually, like I said, Captain Clemmons advised me she was a fugitive from Dallas, Texas, and I advised her of that prior to going into her purse.

"Q. Who actually made the arrest?

"A. As far as what, sir?

"Q. Any charges that were filed against her?

"A. I did.

"Q. And what were the actual charges?

"A. Possession of counterfeit money and fugitive from Dallas, Texas.

"Q. She has this charge against her now, fugitive from justice?

"A. I don't know if she has that charge against her now.

"Q. Just a moment. Deputy O'Connor, getting back to the informant.

"A. Yes, sir.

"Q. This is an informant that is known to you?

"A. Yes, that's correct.

"Q. You know his address?

"A. I refuse to answer that.

"MR. DUNNE: Your Honor—

"THE COURT: You don't have to answer that.

"MR. ADCOCK: I just asked him if he knew his address.

"THE COURT: It doesn't make any difference if he does or not.

You don't have to answer it.

"BY MR. ADCOCK [Attorney for Sweda]:

"Q. Is this man still alive?

"A. I refuse to answer that." [Vol. II Rec. pp. 5–10.]

On examination by Government counsel, Dr. Dunne:

"Q. Now, did you take the purse from her?

"A. No, sir, I did not.

"Q. How did you have her empty her purse?

"A. She took the items out of the purse herself.

"Q. Did she take everything out?

"A. No, sir. Deputy Torrence found the money in the purse.

"Q. How was it he found the money?

"A. It was in the bottom of the bag and he reached into the bag. She had emptied—supposedly had emptied all of the contents out on to the desk. Deputy Torrence reached into the bag and that is when he found the money." [Vol. II Rec. pp. 13, 14.]

On re-examination by counsel for Sweda, Mr. Adcock:

"Q. Mr. O'Connor, you stated, in line with what he just asked you—you said you placed Miss Sweda under arrest then for possession of counterfeit money?

"A. No, sir. Fugitive from Dallas, Texas.

"Q. I understood that you had testified earlier that you had placed her under arrest about five minutes before you searched her purse?

"A. Yes, sir, as a fugitive from Dallas, Texas.

"Q. For counterfeiting?

"A. No, sir, not for possession of counterfeit money until after Deputy Torrence reached in the purse and brought the money out.

"Q. Well, I misunderstood you.

"BY THE COURT:

"Q. Let me get this straight. When she was brought in first, was she immediately charged with something?

"A. No, sir.

"Q. What happened before she was charged?

"A. Well, —

"Q. To lead you to charge her with something.

"A. Well, Captain Clemmons advised us, sir, that he had received a call, a telephone call from Dallas, Texas, stating that the occupants of this vehicle which they were stopped in were wanted in Dallas, Texas.

"Q. Do you know why they had stopped the vehicle? Were you there when they stopped them?

"A. No, sir.

"Q. So you don't know why.

"A. No, sir.

"Q. So you were advised then that they [sic] wanted in Dallas, Texas?

"A. Yes, sir, fugitive from Dallas.

"Q. Then what did you do? Did you immediately charge her with being a fugitive?

"A. Yes, sir. I advised her of her rights.

"Q. And you placed her under arrest only on that one?

"A. Yes, sir, I told her she was wanted as a fugitive from Dallas, Texas.

"Q. Then it was after that—

"A. Yes, sir.

"Q. —that the purse—the contents of the purse—

"A. Yes, sir. Deputy Torrence reached in her purse, after I had asked her

to empty her purse. Actually she had taken everything out and laid it on the desk.

"Q. Why did she take everything out of her purse?

"A. To see if she had anything in it as far as contraband or counterfeit money.

"Q. What made you think that she might have had counterfeit money, when she was arrested only for being a fugitive? Did you know what she was a fugitive from?

"A. With reference to stolen securities, supposedly the occupants of this vehicle. But the fact that James Bateman was also in the car with her, and he did, according to my informant have counterfeit money.

"Q. Had you been advised what she was a fugitive from before she was placed under arrest?

"A. No, sir." [Vol. II Rec. pp. 14, 15, 16.]

On re-examination by Government counsel, Mr. Dunne:

"Q. Lieutenant O'Connor, just to clarify things, at what time did you have Miss Sweda empty her purse?

"A. Approximately seven o'clock. Earlier I had asked her for identification and she had taken some items out and showed me her identification.

"Q. And you had that form signed at seven o'clock charging her with possession of counterfeit bills, is that correct?

"A. Well, fugitive from justice and a few minutes after that, we found the money. Then I charged her with possession of counterfeit money.

"Q. In other words, you added the possession of counterfeit money later on?

"A. Yes, sir, after fugitive from justice.

"Q. Now, was the only purpose for having Miss Sweda empty her purse the fact that you were looking for counterfeit money?

"A. Yes, sir.

"Q. Were you in any fear that she might have a weapon in her purse?

"A. No, sir. Like I say, she had taken everything out of the purse.

"Q. Is it normal procedure to have women empty their purse when you bring them in?

"A. Yes, sir, we do, looking for weapons, contraband or anything else they might possibly have."

[Vol. II Rec. pp. 16, 17.]

*Major Sliman*

On initial examination by counsel for Sweda, Mr. Adcock:

"Q. On this date [August 4, 1970], Major Sliman, did you have cause to arrest one Earline Robin Sweda?

"A. I didn't participate in the actual arrest, but I did participate in the investigation which led to her arrest.

"Q. Would you tell the Court what was the initial contact that you had regarding this investigation and what transpired?

"A. At about one thirty on August 4, 1970, I received a phone call from Lieutenant George O'Connor of my office who was at the time on vacation. He told me he had received some information to the effect that one James Bateman was in possession of a large amount of counterfeit money. As I recall the amount he gave me was about four thousand dollars counterfeit money.

"Q. Do you know who this person he received this call from was?

"A. (No response.)

"MR. DUNNE [Assistant U.S. Attorney]: Your Honor, I object to the question.

"THE COURT: If it's a confidential source, you don't have to divulge it.

If it is not a confidential source, you should divulge it.

"THE WITNESS: It's a confidential source.

"THE COURT: All right.

"MR. ADCOCK: Thank you.

"BY MR. ADCOCK:

"Q. Okay, James Bateman is the man you had received information on from George O'Connor, was suspected of having counterfeit money?

"A. Yes, sir.

"Q. Then tell us what happened. After you received this call from Lieutenant O'Connor [promoted from Sergeant to Lieutenant].

"A. I immediately left my residence and tried to locate James Bateman and the automobile which Lieutenant O'Connor described to me over the phone. It was a '64 black Oldsmobile with Louisiana license 326B—boy—103. I was unsuccessful at first in locating the automobile. I had a passenger in my car, because I was at home and I was driving my mother-in-law somewhere, so I called the office for assistance. I let my mother-in-law take the car I was in and I got together with Captain Clemmons; and we subsequently called for other deputies to assist us in locating the Oldsmobile.

"Q. Who located the Oldsmobile, Major Sliman?

"A. As I recall Lieutenant Crais did, but I'm not sure exactly who located it, but during the search for the automobile, I heard Lieutenant Crais say that he had the car in sight and he was following it. Shortly after that, the car stopped and I proceeded to the place where it stopped, in the vicinity of 638 North Eighth Street.

"Q. Was an arrest made at this time?

"A. No, sir, when I got there the car was empty. The occupant of the car had gone into an apartment complex.

"Q. What did you do then?

"A. We put the complex under surveillance and Captain Clemmons and I returned to the office to get some information or to check out another car which was in close proximity to Bateman's vehicle.

"Q. What was the cause for checking this vehicle out?

"A. Because we had received information that that car was in the possession of Harvey Gene Love who I was very familiar with, and it had a Texas license plate on it; and it just aroused our suspicions.

"Q. It aroused your suspicions because of Harvey Gene Love?

"A. Yes, sir.

"Q. No other reason?

"A. That's why that particular car, the yellow Chevrolet with the Texas license on it. When I found out that that car was in the possession of Harvey Gene Love, that in itself aroused my suspicions on the Chevrolet.

"Q. With this suspicion aroused, Major Sliman, what did [sic] do? Did you make any attempt to—

"A. I instructed Captain Clemmons to make a long distance phone call to Texas to get a disposition check on the Chevrolet, which he did." [Vol. II Rec. pp. 28–31.]

On examination by Government counsel:

"A. I left instructions with all of the officers, particularly Captain Clemmons, when I left he was then in charge of the investigation. And I had some contact with him while I was gone. He called me once or twice to tell me how the investigation was progressing.

"Q. Was it your instruction to place Mr. Bateman under arrest if he tried to leave the Parish?

"A. I didn't use the word arrest, I don't believe; but my thought was

that if he tried to leave the Parish, we had sufficient probable cause to stop the automobile he was in and search it for the counterfeit money. That was the theory I was going on. Of course, the case developed otherwise. I understand the car was stopped for speeding. Whether they had been speeding or not, my instructions were to stop the car.

"MR. DUNNE: I tender the witness." [Vol. II Rec. p. 36.]

On re-examination by counsel for Sweda, Mr. Adcock:

"Q. Were your instructions to arrest Bateman or to stop Bateman, or stop the car, or stop everybody in the car and the car?

"A. Well, my instructions were to stop Bateman. I didn't anticipate there would be other people in the car when I first gave the instructions. But had I known other people were going to be in the car, that wouldn't have changed my instructions. We were after Bateman and if somebody else was with him and we stopped the car, we'd have to stop those people, too.

"Q. But it is your understanding that Bateman was arrested for speeding, is that correct?

"A. He was initially stopped for speeding, by Sergeant Tycer. That is what was in Sergeant Tycer's mind. In my mind I was looking for counterfeit money. When I left, it was my intention for them to stop him whether they were speeding or whatever they were doing, to stop the car and not let it get away."

[Vol. II Rec. pp. 36, 37.]

*Captain Clemmons*

On initial examination by counsel for Sweda, Mr. Adcock:

"Q. Stop here for just a second. What was the cause for detaining this automobile with Bateman in it?

"A. He was supposed to be in possession of some counterfeit money.

"Q. How did you know this?

"A. From what Major Sliman told me.

"Q. Do you know how he knew this?

"A. He had received information from Lieutenant O'Connor.

"Q. Because he had received information from Lieutenant O'Connor?

"A. Yes, sir.

"Q. Let's see if I have this correct now: Lieutenant O'Connor told Major Sliman that this automobile should be stopped with Bateman in it, and O'Connor—I mean Sliman told you and this is the reason for the detention of the automobile with Bateman in it?

"A. Yes." [Vol. II Rec. p. 19.]

"Q. And what was the reason for her detention?

"A. The main reason for her detention and arrest was a telephone conversation that I had with Deputy Sheriff in McKinney, Texas.

"Q. What did this Deputy Sheriff tell you, sir?

"A. He told me that the occupants of a yellow Chevrolet which we were checking on was wanted by the Secret Service out of Dallas, Texas, for possession of stolen securities and notes.

"Q. But this was not a yellow Chevrolet, was it?

"A. The vehicle—When they were stopped, they were traveling in this vehicle we were checking on.

"Q. Which vehicle was this?

"A. A yellow Chevrolet.

"Q. How did the Oldsmobile come into play?

"A. Bateman had been in that car prior, earlier that evening, in the Oldsmobile.

"Q. And this Deputy Sheriff in McKinney, Texas, you had a conversation with him?

"A. Yes, sir.

"Q. And exactly what did he tell you?

"A. I had called him earlier in the evening when we got the license number on the Chevrolet and requested a disposition on it, because it was registered to someone living in McKinney. And he called me back and told me the car belonged to a subject by the name of Bill Salmon who was in custody in Panama City, Florida, on a counterfeit charge; and that this car was wanted by the Secret Service out of Dallas and its occupants."

[Vol. II Rec. pp. 20, 21.]

"Q. Were you involved in any matter with the arrest of Earline Robin Sweda?

"A. I told Lieutenant O'Connor to place her under arrest, advise her of her rights to question her.

"Q. And what was she to be charged with?

"A. Fugitive from Dallas.

"Q. Fugitive from Dallas. Now, could this be—What did you base this charge on?

"A. On the telephone conversation with the officer in McKinney, Texas.

"Q. The officer in McKinney, Texas, said that she was a fugitive from Dallas, Texas?

"A. Not as Earline Sweda, but occupants and vehicle were wanted. I figured if the vehicle is wanted, anybody that is traveling in the vehicle would be wanted until such time as we could find out that they weren't involved.

"Q. Did you have any more direct knowledge regarding Miss Sweda? That you haven't told us about?

"A. Not that I can recall." [Vol. II Rec. pp. 24, 25.]

*Sergeant Tycer*

On initial examination by counsel for Sweda, Mr. Adcock:

"A. I arrested the occupants—driver and occupants of a—I think—a '65 yellow Chevrolet, driver for speeding.

"Q. You arrested the driver and the occupants for speeding?

"A. I was under instructions to bring the occupants of the car—arrest them and bring them to the courthouse.

\*   \*   \*   \*   \*   \*

"Q. Sergeant Tycer, what was your first involvement in this case?

"A. At about I'd say four o'clock in the evening, Major Sliman asked me to meet him in regard to these people; and I did. And he said just to stay in the downtown area and that I would be further advised.

\*   \*   \*   \*   \*   \*

"Q. It is your testimony that you stopped the driver of the automobile—who was driving? Who was driving the automobile?

"A. Love.

"Q. Love. And you stopped Mr. Love for speeding.

"A. I had instructions not to let them leave the parish if I was in pursuit of them.

"Q. Who gave you these instructions?

"A. Major Sliman.

"Q. Did he tell you why?

"A. He said it had to do with counterfeiting."

[Vol. II Rec. pp. 39, 40, 41, 42.]

On examination by counsel for the Government, Mr. Dunne:

"Q. Did you place all the occupants of the car under arrest?

"A. Yes, sir.

"Q. What for?

"A. Under my instructions from Major Sliman, suspicion of counterfeiting. And the driver for speeding at that time.

"MR. DUNNE: I tender the witness."
[Vol. II Rec. p. 44.]

# 504

On re-examination by counsel for Sweda, Mr. Adcock:

"Q. Did you place Miss Sweda under arrest for suspicion of counterfeiting at the scene of the—

"A. Yes, sir.

"Q. You advised her of her rights?

"A. I did not. I did not question her.

"Q. Was she told that she was under arrest?

"A. I asked her to come to the station. I assume if they did—they got in the back of the car without any resistance.

"Q. At any time, did Miss Sweda tell you she wanted to leave?

"A. No.

"Q. Had she told you she wanted to leave, would you have let her leave?

"A. No, sir.

"Q. Had you told her at any time what charges were against her?

"A. No." [Vol. II Rec. pp. 44, 45.]

## APPENDIX "B"

*District Judge's Reasons for Denying Sweda's Motion to Suppress*

"THE COURT: Gentlemen, there seems to be some conflict as to the reasons why certain things were done in this case, but as far as stopping the car because of speeding, I have no doubt but what that was done more because of the fact that the occupants were who they were than because of what they were doing. Because of course Major Sliman gave the instructions not to let the car leave the Parish. So I think that the fact that they were speeding was probably the catalyst that brought the immediate arrest around, but I think the arrest was really—or the detention of these people was really made because of the fact that they were under suspicion of being wanted for other law violations; but I don't think that that fact is particularly important. I believe that there was probable cause to believe to start with that the defendant Bateman, of course, was wanted for counterfeiting and probably was engaged in or connected with counterfeiting in one way or another; there is nothing to show that the source of information was not reliable. I think that the indication is that it was reliable, insofar as they testify—the officers testified that whatever the source was, it had been used before and had proved reliable. Consequently I think there was sufficient reason to conclude that the information received was reliable.

"Now, following that, the facts that Sergeant Tycer took these people to the courthouse, and as he stated they were not placed under arrest at that time, but they were taken to the courthouse in custody; and, of course, no one is claiming that their rights were not explained to them, but Miss Sweda was not questioned at that time, anyway, so, of course, that is not important one way or the other, but she was taken to the Courthouse.

"As I understand the testimony, it was after they got to the courthouse that the arresting officers, or the officers in charge, were informed from Dallas or from Texas some place that the occupants of this automobile were wanted as fugitives in connection with possession of stolen securities, notes, or something to do with stolen securities and notes. I believe at that time—and it was after that information was obtained that this defendant, Miss Sweda was formally arrested and charged as a fugitive. I believe at that time the arrest was proper and was made based upon probable cause.

"Now, I realize that at the time the automobile was stopped, these people were initially apprehended, that the only person whose name was known to the law enforcement officers was Bateman; and that he was known to them as a person who was suspected of having counterfeit money in his possession. But under federal law, an accomplice is treated as a principal. And it seems to me that it certainly is reasonable to assume that if one person in an automobile is be-

lieved to be and there is probable cause to believe to be in violation of the law, particularly this type of offense, that the others with him can be assumed to be accomplices; and I believe there is no question that there was probable cause to detain all three occupants of the car, if there was probable cause to detain Bateman; and there was obvious probable cause to detain Bateman.

"Now, since there was probable cause to detain and to arrest defendant Sweda on the grounds of being a fugitive, then I conclude that the search, if we can consider it a search, was incident to a lawful arrest and the proceeds of the search are competent—constitute competent evidence.

"Now, the one thing that worries me a bit is that there was a statement made by one of the officers that the purpose of emptying the purse was not for the purpose of simply searching for a weapon or searching for something of that nature or to protect the possessions of the person arrested, but at the time the purse was emptied, the money was not taken out, but that the officer reached into the purse and found it and did so because he was in fact looking for counterfeit money. This was, of course, before defendant Sweda was charged with counterfeiting. She was charged with counterfeiting after the officer in that manner found the bills. But on reflection, I don't believe that that fact is sufficient to suppress the evidence for the simple reason that if the defendant Sweda was properly arrested after probable cause is shown on the grounds of being a fugitive from justice, then, the fact—at that time the officers have testified that they were aware of the fact that she was a fugitive or that the occupants of the car were fugitives from justice in connection with having in their possession stolen or improper securities. So, if the arrest was proper as being a fugitive from that kind of offense, then certainly the actual search in connection with the arrest was a lawful search incident to the arrest; and any evidence in support of the charge for which she was arrested, even though it was termed as being a fugitive from justice, nevertheless a fugitive charge was based upon the possession of improper securities. And I think that the evidence obtained as a result of that search which was incident to a lawful arrest is competent evidence.

"For these reasons, the motion to suppress will be denied." [Vol. II Rec. pp. 53–57.]