**REVISED**

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 95-50890
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRY DARNELL WESTBROOK, WAYNE ALLEN BLEDSOE,
JR., MICHAEL LYNN PEOPLES, AND A.J. GREEN,

Defendants-Appellants.

Appeals from the United States District Court
For the Western District of Texas

August 5, 1997

Before EMILIO M. GARZA, PARKER, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendants Larry Darnell Westbrook, Wayne Allen Bledsoe, Jr., Michael Lynn Peoples, and A.J. Green appeal their convictions for conspiracy to possess crack cocaine with intent to distribute and to distribute crack cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) (count 1) and Westbrook and Bledsoe appeal their convictions for money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (count 2). Westbrook also appeals the district court's calculation of his offense level under the U.S. Sentencing

Guidelines, which resulted in a guideline range of life imprisonment on count 1. We affirm.

I

After a federal grand jury returned a two-count superseding indictment against the defendants, the district court selected a jury to try them on these charges. On September 16, 1994, after a few days of trial, the court learned that one of the jurors had reported to various people))including another juror))that she had been threatened that morning with injury if the jury rendered a guilty verdict. The court immediately granted the defendants' motions for a mistrial. On May 1, 1995, the court selected another jury to try the defendants.

The government's case against the defendants, who lived in Temple, Texas, was based on (1) testimony of accomplices to the defendants, (2) surveillance and seizures by Temple police, and (3) information from third parties.

Because the defendants challenge the sufficiency of the evidence, we summarize it here.

A
Crack Dealing

Jerry Reed, an accomplice of the defendants, testified that he sold two ounces of crack to Westbrook in October 1988; that he asked Westbrook, Bledsoe, and Green to buy two ounces of crack in 1991; that Green delivered crack to him; and that Peoples asked Reed in 1991 to take Peoples and another to Dallas, Texas to buy nine ounces of crack. Chuck Jones, another accomplice, testified that between 1989 and 1990, he sold one to three ounces of crack to

-2-

Westbrook five or six times, and sold quarter to half-ounce quantities of crack to Green and Peoples several times; that after August 1991, he sold five to nine ounces of crack to Westbrook four times, and smaller quantities to Green and Peoples two or three times; that Green was present once when Jones sold Westbrook nine ounces of crack; that he operated a crack house in Temple, and was told by Green and three others to get out of town because he was making all the money.

A third accomplice, Edward Montgomery, Jr., testified that Westbrook and Green had been partners in the drug business, and that Bledsoe replaced Green after an arrest; that he drove Westbrook to Houston four or five times to buy cocaine; that Westbrook met with a source in Houston, Texas and usually bought about nine ounces of crack from that source; that Peoples went on a trip to Houston when Westbrook bought four or five ounces of crack; that Bledsoe carried the money during a crack-buying excursion to Houston with Montgomery and another; and that others, including Green, gave Westbrook money to buy crack for them.

During 1991, the police began to investigate what appeared to be the defendants' crack operation. On August 11, 1991, police raided a motel room after motel staff received complaints about what seemed to be drug traffic. The police found Bledsoe, Peoples, Green, and two others in the room. The police took a baggie from Green containing thirty-seven rocks of crack. A couple of months later, police stopped Westbrook driving a car belonging to Peoples after a high-speed chase. Green was in the front passenger seat.

-3-

Police seized crack from floor between door and front passenger seat, and from the floor behind the front passenger seat.

## B
## The First Crack House

Roderick Reeders, an accomplice and convicted crack dealer, testified that Westbrook and Bledsoe operated several crack houses in Temple during 1991 and 1992.  He stated that Westbrook and Bledsoe approached him in late 1990 or early 1991 and asked him to introduce them to his cocaine source in Houston.  Reeders then took them to Houston and bought two ounces of crack for them from his source.  Westbrook and Bledsoe paid Reeders in crack.  According to Reeders, the three returned to Houston the next day and bought another four or five ounces of crack.  Reeders saw Westbrook and Bledsoe break the crack into rocks.  Shortly thereafter, Reeders and Bledsoe returned to Houston and bought nine to twelve ounces of crack.  Reeders testified that during the next six or seven months, Reeders and Bledsoe went to Houston about twice a week, and Bledsoe bought nine ounces of crack each time.  Reeders noted that, once in Temple, Bledsoe and Westbrook cut the crack into rocks and sold them.  After a time, Reeders and Bledsoe went to Houston less often but bought half and whole kilograms of crack.  In 1992, they began buying powder cocaine and converting it to crack.  Eventually, Westbrook and Bledsoe went to Houston to buy cocaine without Reeders.  Westbrook and Bledsoe initially sold the crack at a city park in Temple but then opened a crack house at 305 South 18th Street.  Reeders showed Westbrook and Bledsoe how to operate the crack house and where to put lookouts.  According to Reeders,

-4-

Westbrook and Bledsoe paid workers $50 a day and small quantities of crack, and crack house workers sold several thousand dollars of crack daily and gave the money to Westbrook or Bledsoe.

David Wright, an accomplice, testified that he worked as a lookout in exchange for crack but began peddling that drug when Westbrook and Bledsoe told him he could make more money as a seller. Wright stated that he gave his drug proceeds to someone else, who hid the money and then gave it to Westbrook and Bledsoe. Westbrook and Bledsoe supplied the house with two or three ounces of crack daily. Several times, Peoples and Green brought crack to the house, which Wright sold for them with the approval of Westbrook and Bledsoe

Montgomery worked around the house as a lookout in exchange for crack. According to him, Westbrook and Bledsoe supplied the workers at the house with crack and handled money from its sale. He admitted that he stole crack that Westbrook had hidden in garage next to Westbrook's residence. In addition, Roderick Walker testified that he saw Westbrook and Bledsoe possess 4 x 12 inch packet of powder cocaine in Westbrook's residence. Allen Robinson said that Westbrook hassled him after Robinson found some crack in the alley, sold some of it and smoked the rest. Reeders testified that crack sold at the house was hidden outside, first next to a garage and then in an alley across the street.

On February 5, 1992, Temple police raided the South 18th Street crack house, finding drug paraphernalia. Reeders testified that just as the police arrived, Westbrook flushed about $500 worth

of crack down the toilet.  Eleven months later, relying on a tip from an informant, officers found $22,500 of crack buried in the alley across from the crack house.  The next month, after another tip by an informant, police discovered two packages of crack worth $900 buried in the alley.

The South 18th Street crack house closed after a year and few months of operation.

C
The Second Crack House

After the South 18th Street crack house shut down, the defendants purportedly opened a second crack house at 903 South Henderson.  Wright testified that he rented this house at Bledsoe's request and paid the rent with money from Westbrook and Bledsoe.  According to Reeders, as much as $10,000 worth of crack was sold daily and crack supplies were hidden either outside the house or at a residence at 902 South 18th Street which was connected to the Henderson Street house by a trail.  Moreover, Westbrook and Bledsoe allowed Peoples and Green to sell crack at the South Henderson house, and Reeders sold for both Peoples and Green there.  Wright testified that he sold crack at the South Henderson house, and that Bledsoe and Westbrook used many of the same workers there.  He also averred that drugs were hidden near the alley at back of property, and that he sold crack for Peoples and Green.

On June 22, 1993, police raided the South Henderson house.  Just before they searched the residence, they observed behavior consistent with drug dealing.  According to Walker, who was at the house during the raid, Westbrook told a certain juvenile to get

-6-

something and that juvenile returned with a small bag of what Walker thought was crack. As the police entered, Walker heard Westbrook tell the juvenile to get rid of the bag. The police then found Westbrook with marijuana hidden in his mouth and $700 in small bills and the juvenile with crack in his mouth and $610 in small bills. In addition, officers discovered crack scattered on the floor of the house as well as a car with some of Peoples' belongings on the premises.

After the raid, the defendants allegedly ended operations at the South Henderson crack house

## D
## The Third Crack House

Undaunted by the raid on the South Henderson house, Westbrook and Bledsoe then supposedly rented a third crack house, at 705 South 20th Street. At Bledsoe's request, the house was leased in Reeders' name. Wright testified that Green told him they had a crack house on South 20th Street and asked Wright to sell crack for him there. On August 12, 1993, the police raided this crack house. In the house, officers found crack, containers with crack residue, and crack paraphernalia. Moreover, on the property surrounding the house, they discovered crack concealed in container.

Wright stated that Green left shortly before police arrived.

## E
## Other Links

During the trial, the government presented much testimony as to the defendants' presence at the various crack houses and similar locations. A police officer, for instance, testified that he saw

Bledsoe as well as Peoples' car at the South 18th crack house, and spotted Westbrook, Bledsoe, and Green at the house at 902 South 18th Street that later testimony revealed was a storage place for crack sold at Henderson Street crack house. In addition, two policemen noted that they saw Peoples and Bledsoe at the 902 South 18th Street house. One of these officers also observed Westbrook, Peoples, Bledsoe, and Green at Westbrook's residence, where the police found several guns, currency, drug paraphernalia, drug ledgers and other documents. Also at the residence, officers discovered crack in a plastic bag hidden in an adjoining garage as well as trace amounts of cocaine in the house, in Westbrook's car, and on his clothing.

Finally, an analysis of toll records for the cellular phones and pagers leased by Westbrook, Bledsoe, and Peoples showed many communications between them from mid-1992 to mid-1993.

F<br>Car Buying

In April 1992, Reeders, Westbrook, Bledsoe, Stevie Brown, and Marty Trejo went to Teem Hem, a car dealer in Houston who goes by the moniker Captain H. According to testimony by Reeders and Hem, Reeders negotiated to buy two Mercedes-Benz cars for Westbrook and Bledsoe for $19,500 in cash. Hem put title to Westbrook's car in Trejo's name and title to Bledsoe's car in Brown's name. Reeders testified that Westbrook and Bledsoe had the cars registered in the names of Trejo and Brown because those individuals had jobs and could explain the source of the money used to buy the cars. Trejo, a relative of Westbrook, testified that he allowed his name to be

-8-

used for Westbrook's car because Westbrook claimed he had left his driver's license in Temple. Trejo stated that he was uncomfortable knowing that his name was on the title for Westbrook's car and, over the next few months, repeatedly asked Westbrook to change the title. Westbrook even had repairs done in Trejo's name.

The police routinely saw Westbrook and Bledsoe driving the two Mercedes. Officers even stopped Bledsoe a couple of times while he was driving his Mercedes. Also, Walker testified that he saw Westbrook and Bledsoe drive the cars to the crack house on South 18th Street.

G
Cracking Down

After hearing and seeing all the evidence, the jury found the defendants guilty on both counts. The district court then sentenced both Westbrook and Bledsoe to life imprisonment on count 1, a concurrent 240 months on count 2, five years supervised release, a $3000 fine, and a $100 mandatory assessment. Peoples received 235 months in jail, five years supervised release, a $3000 fine, and a $50 mandatory assessment. Green received 210 months in jail, five years supervised release, a $3000 fine, and a $50 mandatory assessment.

On appeal, the defendants argue that their rights under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, were violated and that insufficient evidence exists supporting their convictions for conspiracy. In addition, Westbrook and Bledsoe contend that there was not enough evidence to convict them of money laundering. Finally, Westbrook maintains that there was insufficient proof to

establish that he possessed a dangerous weapon, and thus the district court erred in adding two points to his offense level on count 1. We examine each of these arguments in turn.

## II

The district court granted the defendants' motions for a mistrial on September 16, 1994, after several days of trial. At that time, the district court stated that it "expected" that the defendants would order transcripts from the first trial to prepare for the second one, but that these transcripts would be delayed because the court reporter was in the midst of making transcripts from a two-month criminal trial involving eleven members of the Branch Davidian sect.[1]

---

[1] The government claims that the defendants requested transcripts from the first trial on September 16 and, as support, cites to the transcript of the September 16 proceedings. The September 16 transcript, though, was not in the record at the time the government filed its brief. Thus, the government did not follow Local Rule 28.2.3. *See* 5TH CIR. R. 28.2.3 (providing that "[e]very assertion in briefs regarding matter in the record shall be supported by a reference to the page number of the original record where the matter relied upon is to be found"); FED. R. APP. P. 10(a) (stating that the record on appeal includes "the transcript of proceedings, if any . . ."). Moreover, there is no evidence that the government made any attempt to use Rule 10(b)(3) of the Federal Rules of Appellate Procedure to ensure that the defendants filed a copy of the September 16 transcript. Ultimately, this court had to ask the parties to supplement the record with the transcript after oral argument.
    More disturbing, though, is that, upon examining the transcript (and the rest of the record), we can find absolutely no basis for the government's assertion that the defendants asked for the transcripts on September 16. Rather, the district court merely seemed to *assume* that the defendants (and presumably also the government) would want the transcripts and, on that basis, informed them that there might be a delay. As the district court averred, "I don't know when this case will be reset . . . . There's going to be a problem, though, in that it would be expected that you would seek a copy of the transcript of the trial as it progressed this far for use in a second trial. The problem is, as you know, [the

On October 31, 1994, the district court *sua sponte* scheduled the new trial for November 28, 1994. Shortly thereafter, Peoples sought to continue the trial. On November 8, the court granted Peoples' motion, finding that the ends of justice outweighed the interest of the defendant and the public in a speedy trial and that the failure to grant a continuance would deny counsel for the defendant reasonable time to prepare. The court also determined that the time between November 28 and the "first available trial date after completion of the transcript" would be excluded from computation under the Speedy Trial Act, and that its order would apply to all defendants.

On November 23, the defendants filed a joint motion requesting transcripts from the first trial. On November 30, the district court granted the motion as to certain witnesses. On December 9, Green submitted the authorization form ordering the transcripts. On February 10, the court reporter completed and filed the transcripts. On February 13, the district court *sua sponte* set trial for May 1, 1995. On April 4, 7, and 14, the government filed petitions for writs of habeas corpus ad testificandum; the district court decided these petitions on, respectively, April 5, 13, and 17.

On April 28, Green filed a motion to dismiss the indictment, alleging that his Speedy Trial Act rights had been violated. Green contended that he had not been tried within seventy days as

court reporter] is emersed [sic] in transcribing the Branch Davidian trial." None of the defendants replied to this statement.

-11-

required by 18 U.S.C. § 3161(e), and asked that his indictment be dismissed. *See* 18 U.S.C. § 3161(e) ("If the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final.") No other defendant joined the motion. In his motion, Green argued that time both before and after the February 13 order had not been excluded, and that unexcluded time from the date of the mistrial to the date of the second trial was well in excess of seventy days.

The court considered Green's motion on May 1, the day of trial. During arguments on the motion, Green effectively conceded that much of the delay in going to trial was due to the defendants' desire for transcripts from the first trial. Thus, Green stated that he was only "focusing" on the delay after the transcripts were completed (i.e., after February 10), which amounts to about seventy-nine days. The district court denied Green's motion on the basis that this period was "a reasonable exclusion time." After this ruling, the following exchange occurred between the district court and counsel for Peoples:

> THE COURT: . . . Any other matters we need to take up before we bring in the jury?
>
> MR. SWANTON: Judge, I want to say something on the record. May I assume that your ruling with respect )) since we have multiple Defendants, that one objection by one Defendant will apply to all and we don't need to join in those objections?
>
> THE COURT: Yes. And you certainly don't need to all stand up and say you have no objection when something is offered. I'll just make eye contact, and if I don't see anybody turning red or standing up, then we'll assume there are no objections.

On appeal, all the defendants argue that the district court erred in denying Green's motion to dismiss the indictment for violation of the Speedy Trial Act.  While this court reviews facts supporting a ruling under the Speedy Trial Act for clear error, we review legal conclusions *de novo*.  *United States v. Ortega-Mena*, 949 F.2d 156, 158 (5th Cir. 1991).

While all of the defendants contend that they were tried more than seventy days from the date of the mistrial, they disagree on how many days actually elapsed under the Speedy Trial Act.  Peoples argues that the relevant time period is from February 10, the date the transcripts were completed, to May 1, the day of the trial (about seventy-nine days).  Westbrook seems to suggest that most of the time from September 16 to May 1 is nonexcludable.  Bledsoe suggests that the period is from February 13, the date of the district court order setting the May 1 trial date, and May 1 (about seventy-six days).  However, he also states, in a footnote, that "[a]n argument can be made" that the relevant period is February 10 to May 1 and that there were an additional seven days of nonexcludable time before February 10 (a total of about eighty-six days).  Green focuses on the time between the date the transcripts were completed and May 1, but also considers the sixty-odd days before the defendants requested the transcripts (a total of about 139 days).

In response, the government contends that only Green moved to dismiss the indictment on the basis of a violation of the Speedy

Trial Act and that the May 1 trial began within seventy days under the Speedy Trial Act.

A

The government claims that Westbrook, Bledsoe, and Peoples cannot assert a Speedy Trial Act violation because they did not join Green's motion to dismiss the indictment on speedy trial grounds. In reply, the three defendants argue that they did join Green's motion. Alternatively, they contend that, where the government prosecutes two or more defendants together, if one defendant moves to dismiss under the Speedy Trial Act, the other defendants need not explicitly join that motion in order to assert a Speedy Trial Act violation on appeal.

The record is clear that Westbrook, Bledsoe, and Peoples did not explicitly join Green's motion. Westbrook, Bledsoe, and Peoples suggest that the fact that the district court consented to the suggestion of Peoples' counsel that "one objection by one Defendant will apply to all" means that they joined Green's motion. However, this is not persuasive. A fair reading of the transcript indicates that the district court simply agreed to permit an *objection* by one defendant *at trial* to cover all the defendants. Moreover, the district court had earlier denied motions by Peoples and Green to adopt motions filed by their codefendants. The court noted that its "general practice . . . is to deny such motions due to the confusion that results in a multi-defendant case." Hence, Westbrook, Bledsoe, and Peoples did not explicitly or implicitly join Green's motion.

-14-

18 U.S.C. § 3162(a)(2) states that "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section." This provision does not mention any exception. In possible conflict with § 3162(a)(2), Rule 12(f) of the Federal Rules of Criminal Procedure provides that "[f]ailure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court . . ., or prior to any extension thereof made by the court, shall constitute waiver thereof, *but the court for cause shown may grant relief from the waiver*" (emphasis added). Moreover, as the defendants point out, a number of circuits, including this one, have permitted a defendant to raise a district court error on appeal as long as one of his codefendants objected below.

As a threshold issue, we determine that Rule 12(f) arguably applies here. First, the Federal Rules of Criminal Procedure apply in the federal courts of appeals. *See* FED. R. CRIM. P. 1 (noting that "[t]hese rules govern the procedure in all criminal proceedings in the courts of the United States"); FED. R. CRIM. P. 54(a) (stating that "[t]hese rules apply to all criminal proceedings . . . in the United States Court of Appeals"); *cf.* FED. R. CIV. P. 1 (noting that "[t]hese rules govern the procedure in the United States district courts in all suits of a civil nature"). Second, Rule 12(b) lists five categories of defenses, objections, and requests which "must be raised prior to trial . . . . .," one of which includes "defenses and objections based on defects in the

-15-

institution of the prosecution . . . ." An allegation of a speedy trial violation is such a defense and objection. Thus, we determine that an allegation of a speedy trial violation is a defense, objection, or request "which must be made prior to trial."

Next, we note that Rule 12(f) and § 3162(a)(2) conflict over whether courts can permit a defendant to make a Speedy Trial Act objection if he failed to raise such an objection before trial (or at least before a plea of guilty or nolo contendere); Rule 12(f) explicitly allows courts to grant relief from any waiver, but § 3162(a)(2) does not. Although we have found no case recognizing this conflict, it can be easily resolved under existing authority. A statute that takes effect after the effective date of a federal rule repeals the rule to the extent that it actually conflicts. *Jackson v. Stinnett*, 102 F.3d 132, 135 (5th Cir. 1996). Rule 12(f) was added to the Federal Rules on April 22, 1974 and made effective on December 1, 1975. Section 3162(a)(2) was enacted on January 3, 1975 and made effective "to all cases commenced by arrest or summons and all informations or indictments filed, on or after July 1, 1980." Thus, § 3162(a)(2) trumps Rule 12(f).

Even so, the three defendants contend that, under caselaw in this circuit and elsewhere, they did not waive any violation of their speedy trial rights. The defendants rely, for example, on several cases not involving the Speedy Trial Act in which the court of appeals permitted defendants to appeal points that were raised below only by codefendants. *See United States v. Cassity*, 631 F.2d 461 (6th Cir. 1980) (search and seizure); *United States v. Love*,

472 F.2d 490 (5th Cir. 1973) (search and seizure); *United States v. Lefkowitz*, 284 F.2d 310 (2d Cir. 1960) (erroneous instruction). These courts have recognized that little reason may exist to refuse to permit codefendants to appeal such points because (1) at least one defendant properly raised the issue now on appeal and ensured that the district court would consider it (at least with regard to the defendant who raised it), (2) identical challenges mounted by similarly situated codefendants would not have changed the district court's ruling, and (3) if one defendant succeeded in convincing the district court to grant his motion, his codefendants would then simply have filed the same motion. Westbrook, Bledsoe, and Peoples also note that the Speedy Trial Act provides that, if one codefendant seeks an adjournment excludable under the act, the request is imputed to all codefendants. Similarly, they argue, if one defendant moves for dismissal of the indictment for violation of the act, all the defendants should implicitly be regarded as joining in the motion.

We have sometimes allowed a defendant to preserve a district court error as long as one of his codefendants objected below. *See United States v. White*, 589 F.2d 1283, 1290 (5th Cir. 1979) (holding that objection to instructions by codefendant's counsel is sufficient to preserve any error); *Love*, 472 F.2d at 496 (holding that the failure of one codefendant's counsel "to move to suppress the evidence or to object to its introduction should be excused because such a motion or objection would have been a useless formality" given fact that other codefendant's counsel had made

-17-

motion to suppress); *see also United States v. Pardo*, 636 F.2d 535, 541 (D.C. Cir. 1980) ("We recognize that in certain situations, it may be redundant and inefficient to require each defendant in a joint trial to stand up individually and make every objection to preserve each error for appeal."); *Cassity*, 631 F.2d at 466 ("Under these circumstances, we hold the remaining appellants did not waive their fourth amendment objections by neglecting to perform the useless and purely formal act of joining Cassity in moving to suppress."); *United States v. Bagby*, 451 F.2d 920, 927 (9th Cir. 1971) (ruling that objection to instructions by codefendant's counsel preserves any error); *cf. United States v. Alvarez*, 584 F.2d 694, 697 (5th Cir. 1978) (ruling that since "[t]he trial court had already ruled adversely to defendant's contention . . . there was no need for the defense to make the assuredly futile gesture of repeating its objection"); *Lefkowitz*, 284 F.2d at 313 n.1 (ruling that "[w]e do not regard the failure of Dryja's counsel to except as barring Dryja from seeking reversal for error in the charge; Lefkowitz's exception called the matter to the judge's attention and further exception would have been fruitless").[2]  Only one

_____

[2]     In *United States v. Harris*, 104 F.3d 1465 (5th Cir. 1997), *petition for cert. filed* (U.S. May 21, 1997) (No. 96-9169), the defendant argued on appeal that the district court's jury instructions were erroneous.  In district court, a codefendant had objected to the instructions but the defendant declined to challenge them, telling the district court "I don't have any objections to the charge."  We then held that the defendant had not preserved the issue for appeal and thus only examined the instruction for plain error.
    If the defendant states that he will not object to something and then, on appeal, reverses course and raises such an objection, this court should generally apply a plain error standard.  *Id.* at 1472.  There may be times, however, as recognized by this court in

-18-

appellate case, *United States v. Cassity*, appears even indirectly to rely on the "for cause shown" exception of Rule 12(f) in permitting a defendant to preserve an error that a codefendant raised below; the rest simply cite existing caselaw as authority. However, we have found no case allowing a defendant to make such an argument in the speedy trial context))and rightly so.  Section 3162(a)(2) not only preempts Rule 12(f), but the plain language of § 3162(a)(2) provides that failure to move for dismissal for a speedy trial violation "*shall* constitute a waiver of the right to dismissal under this section" (emphasis added).  The Speedy Trial Act provides no exception to this waiver provision, and we may not read one in.  In sum, Westbrook, Bledsoe, and Peoples waived their Speedy Trial Act claims by failing to join Green's motion to dismiss the indictment.

B

The remaining question is whether Green's May 1, 1995 trial date was within seventy days of the date "the action occasioning the retrial becomes final," which in this case is September 16, 1994, the date the district court declared a mistrial.[3]  The

---

*Love*
and *White* where the failure to join a codefendant's objection may nevertheless preserve the issue for appeal.

[3]     When the district court declares a mistrial and one of the parties files a certain kind of appeal, the court of appeals' disposition of the appeal, rather than the declaration of the mistrial itself, is "the action occasioning the retrial." *United States v. Kington*, 875 F.2d 1091, 1108-09 (5th Cir. 1989) (discussing situations where disposition of appeal of declaration of mistrial is "the action occasioning the retrial").  However, there was no appeal here))interlocutory or otherwise))relating to the district court's declaration of mistrial.  Therefore, "the

-19-

starting point for computing this seventy-day period is September 17. *See Government of Virgin Islands v. Duberry*, 923 F.2d 317, 320 n.8 (3d Cir. 1991) (excluding days on which triggering events occur for purposes of calculating time under Speedy Trial Act); *Kington*, 875 F.2d at 1109 (not counting the day that action occasioning retrial became final when computing time under Speedy Trial Act); *cf. Ortega-Mena*, 949 F.2d at 158 (stating, in case not involving mistrial, that the first day of seventy-day period was the day following defendants' indictments). The period of delay "resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is not used in computing the seventy-day limit. 18 U.S.C. § 3161(h)(1)(F). The day that a pretrial motion is filed and the day on which the motion is decided by the court are likewise excluded. *Kington*, 875 F.2d at 1106. All defendants who are joined for trial generally fall within the speedy trial computation of the latest codefendant and the excludable delay of one codefendant may be attributed to all defendants. *United States v. Bermea*, 30 F.3d 1539, 1567 (5th Cir. 1994), *cert. denied*, __ U.S. __, 115 S. Ct. 1113, 130 L. Ed. 2d 1077 (1995). We exclude from computation any delay resulting from a continuance if the district court granted the continuance on the basis of the "ends of

---

action occasioning retrial" must be the declaration of mistrial itself. *See United States v. Menzer*, 29 F.3d 1223, 1227 (7th Cir.) (noting that, where no party appealed declaration of mistrial, "there is no dispute that following the mistrial . . ., the government had seventy days in which to retry the defendant"), *cert. denied*, 513 U.S. 1002, 115 S. Ct. 515, 130 L. Ed. 2d 422 (1994).

justice," and the court sets forth its reasons for so finding. 18 U.S.C. § 3161(h)(8)(A).

The government argues that all the time from September 16 to February 10, 1995 (the date the court reporter completed and filed the transcripts) is excludable because the defendants' caused this delay by asking for these transcripts on September 16. However, as discussed above, there is no evidence in the record that the defendants requested the transcripts until they filed a motion for those documents on November 23. Within the September 16-February 10 period, Peoples sought a continuance on November 4, which the district court granted on November 8 as to all defendants. While the time that had elapsed before Peoples' motion (from September 17 to November 3) is not excludable, the five days from November 4 to November 8 are excludable under § 3161(h)(1)(F). In addition, the defendants (including Green) filed a joint motion on November 23 requesting transcripts, which the district court granted in part on November 30. These eight days are also excludable under § 3161(h)(1)(F). However, the period from November 9 to November 22 is nonexcludable.

In his motion for a continuance, Peoples' counsel stated that he needed more time for trial preparation and also noted that he "anticipates that all defense counsel of record will file a joint motion for the transcript of the preceding trial of this cause which would in all likelihood necessitate a further delay in the present trial setting." The district court accepted this argument, and determined that a continuance would be necessary to ensure that

Peoples' counsel had sufficient time to prepare for trial.  In its order, after making the required ends-of-justice finding under 18 U.S.C. § 3161(h)(8)(A), the district court excluded the time between November 28 (which was then the scheduled trial date) and the new trial date, which the court stated would be "the first available trial date after completion of the transcript."  The transcript was completed and filed February 10.  On February 13, the district court *sua sponte* set the trial for May 1, and the trial began on that date.

The district court's November 8 continuance was an open-ended one in the sense that it lacked a specific ending date.  While the circuits have split over whether a district court may grant an open-ended continuance under § 3161(h)(8)(A),[4] this circuit has

_____

[4]     *Compare United States v. Gambino*, 59 F.3d 353, 358 (2d Cir. 1995) (stating that "[t]he length of an exclusion for complexity must be . . . limited in time"), *cert. denied*, __ U.S. __, 116 S. Ct. 1671, 134 L. Ed. 2d 776 (1996), *and United States v. Jordan*, 915 F.2d 563, 565 (9th Cir. 1990) (holding that Speedy Trial Act "requires that an 'ends of justice' continuance be specifically limited in time") *with United States v. Twitty*, 107 F.3d 1482, 1489 (11th Cir. 1997) (ruling that "[a]n open-ended continuance may be granted to serve the ends of justice"); *United States v. Spring*, 80 F.3d 1450, 1458 (10th Cir.) (ruling that in "rare cases" it will not be possible to set a specific ending date for a continuance and "an open-ended continuance for a reasonable period is permissible"), *cert. denied*, __ U.S. __, 117 S. Ct. 385, 136 L. Ed. 2d 302 (1996); *United States v. Jones*, 56 F.3d 581, 586 (5th Cir. 1995) (holding that district courts may grant open-ended continuances except that continuances for any substantial length of time are extraordinary and must be adequately justified by the circumstances); *United States v. Lattany*, 982 F.2d 866, 868 (3d Cir. 1992) (holding that "open-ended continuances to serve the ends of justice are not prohibited if they are reasonable in length"), *cert. denied*, 510 U.S. 829, 114 S. Ct. 97, 126 L. Ed. 2d 64 (1993); *and United States v. Rush*, 738 F.2d 497, 508 (1st Cir. 1984) (noting that "it is inevitable that in some cases, like the present one, a court is forced to order an (h)(8) continuance without knowing exactly how long the reasons supporting the continuance

held that a district court may sometimes grant such continuances. *Jones*, 56 F.3d at 585-86. In *Jones*, we noted that situations may exist "in which it is impossible, or at least quite difficult, for the parties or the court to gauge the length of an otherwise justified continuance." *Id.* at 586. "In such circumstances, the district court may decide to continue the trial indefinitely, at least until the defendant or the government is able to propose a more specific trial date or until there exists enough additional information for the district court to set one." *Id.* However, if the continuance is "for any substantial length of time [it must be] extraordinary and . . . adequately justified by the circumstances of the particular case." *Id.*

In this case, the district court had been expecting the defendants to request transcripts from the first trial from the date it granted a mistrial on September 16. Moreover, the district court had formal notice that the defendants would ask for the transcripts as early as November 4, the date on which Peoples filed his request for a continuance. Given the uncertainty over when the transcripts would finally be ready (and, more generally, over Peoples' need for additional time to prepare for trial), the district court lacked sufficient information on November 8 to set a specific trial date. Thus, it was perfectly reasonable for the district court to grant an open-ended continuance that extended

---

will remain valid"), *cert. denied*, 470 U.S. 1004, 105 S. Ct. 1355, 84 L. Ed. 2d 378 (1985).

until the first available trial date after the transcripts were ready.

In addition, the continuance only lasted about five months, and the trial itself occurred just two-and-a-half months after the court reporter completed and filed the transcripts the defendants had requested. Such a relatively short period of time is not unreasonable. *See, e.g.*, *Twitty*, 107 F.3d at 1489 (holding that five-month open-ended continuance based on ends of justice did not violate Speedy Trial Act); *Lattany*, 982 F.2d at 874-76 (ruling that one-year delay resulting from district court's grant and then extension of open-ended ends-of-justice continuance was not unreasonable where defendant changed counsel several times and various counsel requested continuances to permit them to prepare for trial); *United States v. Davenport*, 935 F.2d 1223, 1236 (11th Cir. 1991) (determining that seven-month ends-of-justice continuance giving two defendants additional time to prepare for trial was reasonable delay that could be attributed to co-defendant); *cf. Jones*, 56 F.3d at 584-85 (noting that where district court "memorialized" its previous "silent grant" of defendant's motion for a continuance more than a year after he filed the motion, defendant's motion only requested a two-month continuance, and continuance reflected the district court's "oversight rather than deliberation," defendant's speedy trial rights were violated).

We also emphasize that Green requested, accepted, and benefitted from the five-month delay occasioned by the continuance.

-24-

Peoples' motion for the continuance specifically asked that "the trial proceedings be continued and be reset for the first available date following preparation of the transcript[s]." The district court then gave Peoples exactly the relief he sought; the court continued proceedings until further notice and "reset [the trial] for the first available trial date after completion of the transcript." Peoples' motion is imputed to Green for purposes of computation of time under the Speedy Trial Act, so Green effectively joined the motion. Moreover, Green did not object to the continuance at the time the district court granted it, and he did not even allege a violation of his speedy trial rights until the day of trial. *See Twitty*, 107 F.3d at 1489 (suggesting that defendant's failure to object to open-ended continuance cuts against defendant's argument that the delay occasioned by continuance was not excludable under the Speedy Trial Act). The district court also made the findings and statement of reasons required by § 3161(h)(8);[5] it simply declined to set a specific ending date for the continuance because it was unclear when the transcripts would be available. Under these circumstances, Green may not seek "to turn the benefit he accepted into an error that would undo his conviction . . . ." *United States v. Eakes*, 783

---

[5] At oral argument, Green contended that the district court did not make a finding under § 3161(h)(8)(A) why the seventy-nine days between the completion of the transcripts and the trial date should be excluded under the Speedy Trial Act. The court, though, specifically found that the ends of justice would be served by "allowing the Defendant additional time to prepare this case" and that "the Defendant [should not be denied] reasonable time necessary for effective preparation." This finding applies to *all* the time covered by the continuance.

F.2d 499, 503 (5th Cir.), *cert. denied*, 477 U.S. 906, 106 S. Ct. 3277, 91 L. Ed. 2d 567 (1986). "The Speedy Trial Act entitles criminal defendants to adequate time for preparing a defense, but that right may not be used as a two-edged sword in this fashion." *Id.; see also Kington*, 875 F.2d at 1108 (endorsing "the sensible maxim that defendants ought not to be able to claim relief on the basis of delays which they themselves deliberately caused"); *United States v. Mentz*, 840 F.2d 315, 331 (6th Cir. 1988) (concluding that delay caused by defendant's plea vacillation stopped speedy trial clock because otherwise defendant "would have successfully worked both sides of the street lulling the court and prosecution into a false sense of security only to turn around later and use the . . . leisurely pace of the case as grounds for dismissal"); *United States v. Pringle*, 751 F.2d 419, 434 (1st Cir. 1984) (holding that delay created by defendant in mistakenly agreeing to a "waiver" of his speedy trial rights is excludable); *cf. United States v. Willis*, 958 F.2d 60, 64 (5th Cir. 1992) (holding that defendant did not mislead or sandbag the district court and thus cause delay because the district court erroneously induced defendant to "waive" his speedy trial rights without identifying an applicable exception for this under the Speedy Trial Act or performing an ends-of-justice analysis under § 3161(h)(8)). Therefore, we determine that the period from November 28 to May 1 is excludable under the Speedy Trial Act.

In sum, we determine that the periods from November 4 to November 8, 1994 and November 23, 1994 to May 1, 1995 are

excludable under the Speedy Trial Act. Conversely, the periods from September 17 to November 3, 1994 and November 9 to November 22 are nonexcludable. As only sixty-two nonexcludable days elapsed between the date the district court declared a mistrial and the date of the second trial, Green's prosecution did not violate the Speedy Trial Act. Accordingly, we reject all of the defendants' speedy trial claims.

III

Next, the defendants raise various arguments challenging the sufficiency of the evidence supporting their convictions or sentences. Our review for sufficiency of the evidence following a conviction is narrow. *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir.)*, cert. denied*, __ U.S. __, 116 S. Ct. 1867, 134 L. Ed. 2d 964 (1996). We will affirm if a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 62 L. Ed. 2d 126 (1979). We must consider the evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the prosecution. *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct. 457, 469, 86 L. Ed. 680 (1942). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. *United States v. Salazar*, 66 F.3d 723, 728 (5th Cir. 1995). If the evidence, though, gives equal or nearly equal

-27-

circumstantial support to a theory of guilt and a theory of innocence, we will reverse the conviction, as under these circumstances a reasonable jury must necessarily entertain a reasonable doubt. *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir.), *cert. denied*, 506 U.S. 918, 113 S. Ct. 330, 121 L. Ed. 2d 248 (1992).

A

Bledsoe, Peoples, and Green (though not Westbrook) contend that insufficient evidence supports their conspiracy convictions. To convict a defendant of conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt: (1) the existence of an agreement to violate the drug laws and that each co-conspirator (2) knew of, (3) intended to join, and (4) voluntarily participated in the conspiracy. *United States v. Abadie*, 879 F.2d 1260, 1265 (5th Cir.), *cert. denied*, 493 U.S. 1005, 110 S. Ct. 569, 107 L. Ed. 2d 563 (1989). To be a conspiracy, an express, explicit agreement is not required; a tacit agreement is enough. *United States v. Greenwood*, 974 F.2d 1449, 1457 (5th Cir. 1992), *cert. denied*, 508 U.S. 915, 113 S. Ct. 2354, 124 L. Ed. 2d 262 (1993). A person may be guilty as a co-conspirator even if he plays only a minor role, *United States v. Prieto-Tejas*, 779 F.2d 1098, 1103 (5th Cir. 1986), and he need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy. *United States v. Fernandez-Roque*, 703 F.2d 808, 814-15 (5th Cir. 1983). Because

secrecy is the norm in an illicit conspiracy, the elements of the offense may be established solely by circumstantial evidence. *United States v. Espinoza-Seanez*, 862 F.2d 526, 537 (5th Cir. 1988). Although mere presence at the scene of the crime or close association with a co-conspirator will not support an inference of participation in a conspiracy, a common purpose and plan may be inferred from a "development and a collocation of circumstances." *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.) (en banc) (quoting *Glasser*, 315 U.S. at 80, 62 S. Ct. at 469), *cert. denied*, 440 U.S. 962, 99 S. Ct. 1508, 59 L. Ed. 2d 777 (1979). Once the government has produced evidence of an illegal conspiracy, it need only introduce "slight evidence" to connect an individual defendant to the common scheme. *United States v. Krenning*, 93 F.3d 1257, 1265 (5th Cir. 1996) (internal quotation marks omitted). As long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict. *United States v. Lindell*, 881 F.2d 1313, 1322 (5th Cir. 1989), *cert. denied*, 493 U.S. 1087, 110 S. Ct. 1152, 107 L. Ed. 2d 1056 (1990).

The defendants offer somewhat different arguments regarding the sufficiency of the evidence regarding conspiracy. Bledsoe makes two points. First, Bledsoe claims that reasonable doubt exists on whether he was part of a conspiracy because the police did not find him in possession of any drugs other than marijuana.

However, there was voluminous testimony by many of Bledsoe's co-conspirators that Bledsoe was part of the defendants' crack-selling conspiracy. Second, Bledsoe attacks the credibility of the witnesses against him, arguing generally that the witnesses were liars and that they had the incentive to testify against him to avoid being charged themselves. However, Bledsoe had ample opportunity at trial to impeach the witnesses against him by attacking their credibility. Moreover, he did not offer a single witness in his defense. Obviously, the jury considered the witnesses testifying against Bledsoe more credible than Bledsoe himself. Considering the proof presented and construing the jury's credibility determinations in the light most favorable to the government, we do not disagree. A rational jury could certainly have found that the evidence presented against Bledsoe established the elements for conspiracy.

Peoples takes a slightly different tack. He asserts that even if he sold drugs on the same premises as the other defendants, he operated independently of them. Peoples also notes that he was never apprehended in actual possession of crack. However, police seized thirty-seven rocks of crack from Green in a motel room rented by Peoples and in which Peoples was present. Motel staff had also observed what seemed to be drug traffic coming in and out of the room. In June 1993, Peoples was present in front of a crack house in which police found Westbrook present as well as crack. The police also observed Westbrook, Bledsoe, Green, and Peoples associating at the crack houses or at other locations where the

crack was stored.  In addition, Reeders and Wright testified that they sold crack for Peoples with the permission of Westbrook and Bledsoe.

Given this proof, Peoples cannot show that a rational jury could have found that he did not play a role in the conspiracy. The government has produced much more than the "slight evidence" it needs to connect Peoples to the alleged scheme; the evidence strongly suggests that Peoples' participated in the conspiracy in some capacity.

Green attacks the credibility of the government's witnesses, arguing that their testimony was so incredible that no rational jury could have convicted him of conspiracy.  Specifically, Green asserts that the co-conspirators who testified against him were crack addicts, had criminal records, were liars, testified inconsistently, and/or cooperated with the government to avoid prosecution themselves.  At trial, Green presented a witness who testified that Reed would do anything to avoid a life sentence. Green's mother also testified, suggesting that Green had held a number of jobs and did not seem to have much money.

Numerous witnesses, though, including police officers, testified in detail as to Green's involvement in the conspiracy. In addition, there was evidence that police actually seized a large amount of crack from Green.  Examining the evidence offered by the government and Green, we believe there is sufficient credible evidence to support the jury's verdict.

Therefore, we determine that sufficient evidence exists to uphold Bledsoe, Peoples, and Green's convictions for conspiracy.

B

Westbrook and Bledsoe challenge the district court determination that sufficient evidence supported their convictions for money laundering in connection with the purchase of two used Mercedes Benzes.  First, Westbrook contends that no evidence exists indicating that his purchase of his Mercedes was made with drug money.  Second, Westbrook argues that there is insufficient evidence that he intended to conceal or disguise the nature of the unlawful proceeds.  Third, Westbrook and Bledsoe aver that there is no evidence that their alleged money laundering had any connection to interstate commerce.

The applicable money-laundering statute provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1).

Evidence that a defendant's cash outflow in a financial transaction exceeds his legitimate income is sufficient to show that the transaction "involves the proceeds of specified unlawful activity," even if the defendant claims income from other sources.

-32-

*United States v. Webster*, 960 F.2d 1301, 1308 (5th Cir.), *cert. denied*, 506 U.S. 927, 113 S. Ct. 355, 121 L. Ed. 2d 269 (1992). Here, Westbrook and Bledsoe spent $20,000 cash for two Mercedes. However, there was no evidence that Westbrook had any legitimate income; indeed, he did not file any income tax returns during the applicable period. Moreover, ample evidence exists that Westbrook was involved in extensive drug dealing. Thus, a reasonable jury could infer that Westbrook bought his Mercedes using drug money.

To convict Westbrook of money laundering, the government needed to show that he concealed or disguised the nature, the location, the source, the ownership, or the control of the drug money used to buy the Mercedes. There is evidence of such concealment. First, even though Westbrook ultimately possessed the Mercedes and drove around in it, Reeders negotiated for the car and paid for it. Second, Trejo signed the papers for the car. Third, Reeders stated that Westbrook and Bledsoe had the cars registered in the names of Trejo and Brown because those individuals had jobs and could explain the source of the money used to buy the cars. Fourth, Trejo requested that Westbrook take Trejo's name off the title of the Mercedes, but Westbrook refused. Fifth, Westbrook used Trejo's name when he brought the Mercedes to a shop for repairs. All of these actions could convince a reasonable jury that Westbrook, in purchasing the Mercedes, concealed the nature, location, source, ownership, or control of the drug money used to buy it.

Finally, to show that Westbrook and Bledsoe's Mercedes purchases violated 18 U.S.C. § 1956, the government must provide proof of some effect on interstate commerce. *See* 18 U.S.C. § 1956(c)(4) (noting that "the term 'financial transaction' means . . . a transaction which in any way or degree affects interstate or foreign commerce . . . involving the transfer of title to any . . . vehicle"). The use of the words "in any way or degree" suggests that the link to interstate or foreign commerce need only be slight. Indeed, before *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995), courts held that this language only required evidence that the individual transaction at issue had a *de minimis* effect on interstate commerce. *See, e.g.*, *United States v. Peay*, 972 F.2d 71, 74 (4th Cir. 1992), *cert. denied*, 506 U.S. 1071, 113 S. Ct. 1027, 122 L. Ed. 2d 172 (1993). Moreover, after *Lopez*, courts have recognized that this *de minimis* standard continues in effect. *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir.), *cert. denied*, __ U.S. __, 117 S. Ct. 1713, __ L. Ed. 2d __ (1997); *United States v. Grey*, 56 F.3d 1219, 1224-25 (10th Cir. 1995). This is because § 1956 regulates activities that, in the aggregate, have a substantial effect on interstate commerce. *See Lopez*, 514 U.S. at __, 115 S. Ct. at 1629 (stating that "where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence"); *cf. Perez v. United States*, 402 U.S. 146, 154, 91 S. Ct. 1357, 1361, 28 L. Ed. 2d 686 (1971) (holding that Commerce Clause authorizes

-34-

Congress to punish any particular criminal action, even without proof of a relation to interstate commerce, when the activity is part of a "class of activities" determined by Congress to affect interstate commerce); *United States v. Staples*, 85 F.3d 461, 463 (9th Cir.) (rejecting *Lopez* challenge to 21 U.S.C. § 860, which deals with drug trafficking in a school zone), *cert. denied*, __ U.S. __, 117 S. Ct. 318, 136 L. Ed. 2d 233 (1996).  In sum, the government can meet its burden on the interstate commerce element of § 1956 merely by showing that the Mercedes purchases had a minimal effect on interstate commerce.

In *United States v. Gallo*, 927 F.2d 815, 822 (5th Cir. 1991), the defendant was arrested while transporting about $300,000 in cash on an interstate highway.  Evidence existed that this sum was the proceeds of a cocaine sale and that the defendant knew it.  The defendant challenged his conviction under § 1956 on the grounds that his transportation of the money did not affect interstate commerce.  We rejected his argument, holding that, since Congress has generally made clear in 21 U.S.C. § 801 that drug trafficking affects interstate commerce, transportation of drug proceeds (even if purely intrastate) affects interstate commerce.  We explicitly reserved judgment, though, on a case in which the connection between money and drugs was not so clear.

In light of *Gallo*, we think that the government has shown that Westbrook and Bledsoe's purchases of the two Mercedes had a *de minimis* effect on interstate commerce.  First, Congress has determined in § 801 and elsewhere that narcotics trafficking, as a

class of activities, affects interstate commerce. Second, the government presented much evidence that Westbrook and Bledsoe conspired to sell crack, that they bought the two Mercedes with proceeds from their crack sales, and that all cocaine distributed in the United States is manufactured outside the country. Third, the Mercedes purchases facilitated Westbrook and Bledsoe's crack-selling conspiracy. The evidence indicates that this conspiracy generated large amounts of surplus cash. Narcotics traffickers generally try to launder drug proceeds to make it more difficult for law enforcement to trace the illegal activity, prosecute them, forfeit their assets, and assess back taxes. H.R. Rep. No. 746, 99th Cong., 2d Sess. 16 (1986). Here, Westbrook and Bledsoe's purchases of the two Mercedes through Trejo and Brown "cleaned" a large amount of drug proceeds, making it easier for the two defendants to continue the conspiracy. In addition, there is proof that Westbrook and Bledsoe used the two Mercedes as part of their conspiracy. For instance, the police testified that they routinely saw Westbrook and Bledsoe drive the two Mercedes, and Walker testified that he observed Westbrook and Bledsoe drive the cars to a crack house. Thus, we find that sufficient evidence exists that Westbrook and Bledsoe's purchases of the two Mercedes affected interstate commerce "in any way or degree."

Accordingly, we determine that there is enough proof in the record to support Westbrook and Bledsoe's convictions for money laundering.

C

Westbrook argues that the district court's two-point increase in his offense level on count 1 for possession of a dangerous weapon lacked sufficient evidentiary support. This increase helped ensure that Westbrook received a guideline range of life imprisonment on count 1 under the U.S. Sentencing Guidelines. The district court's imposition of the two-level enhancement is a factual determination that we review for clear error. *United States v. Rodriguez*, 62 F.3d 723, 724 (5th Cir. 1995).

Section 2D1.1(b)(1) of the U.S. Sentencing Guidelines provides that "[i]f a dangerous weapon (including a firearm) was possessed, increase [the offense level] by **2** levels." The relevant application note states that "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* comment. (n.3).

There was much evidence in the district court suggesting that Westbrook possessed firearms in connection with his drug trafficking. First, Wright stated that he saw Westbrook and Bledsoe carrying "Uzis." Second, an anonymous caller reported to the Temple police on February 16, 1993 that she saw Westbrook, Bledsoe, and others carrying guns in the 900 block of South 18th Street, a location near a crack house operated by the defendants. Third, there was testimony about two 9 mm handguns at a crack house and about Bledsoe carrying a TEC-9 9 mm pistol, though this was not directly connected to Westbrook. Fourth, and most significantly,

-37-

the police found three weapons in the residence occupied by Westbrook and his mother: a .32 caliber pistol under a cushion of the couch in the living room, and a TEC-9 9 mm pistol and a .45 caliber pistol in the closet of one of the bedrooms. It is unclear who owned the guns or whether Westbrook occupied the bedroom in question. Westbrook claims that, "at one time or another," various other people lived in the house. He also notes that Reeders, a main government witness, testified that he had never seen Westbrook with a gun. In addition, the police found no drugs in the house. However, it is undisputed that Westbrook lived in the house; police found documents belonging to Westbrook in the house; and police uncovered a drug ledger and drug paraphernalia in the house as well as crack hidden in a neighbor's garage (which one witness connected to Westbrook).

On balance, sufficient evidence exists to indicate that Westbrook possessed a firearm in connection with his drug trafficking. While it is possible that Westbrook did not possess the weapons for use in his crack business, any other explanation for the guns found in his home is highly improbable (for example, that his mother or someone who had formerly stayed in the house secreted all the weapons). In the drug business, guns are tools of the trade, *United States v. Martinez*, 808 F.2d 1050, 1057 (5th Cir.), *cert. denied*, 481 U.S. 1032, 107 S. Ct. 1962, 95 L. Ed. 2d 533 (1987), and there was ample evidence that Westbrook possessed dangerous weapons in connection with the sale of crack. Therefore,

the district court did not clearly err in adding two points to Westbrook's offense level.

IV

For the foregoing reasons, we AFFIRM the district court's judgments of conviction as well as its sentences.