**REVISED MAY 2, 2002**
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 00-51177**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**ISMAEL HOLGUIN HERRERA,**

**Defendant-Appellant.**

---

Appeal from the United States District Court
For the Western District of Texas

April 17, 2002

Before SMITH and DeMOSS, Circuit Judges, and DUPLANTIER,[1] District
Judge.

DeMOSS, Circuit Judge:

In a superseding indictment returned on June 21, 2000,
Appellant Ismael Holguin Herrera ("Ismael"), along with Octavio
Herrera ("Octavio"), Sergio Juarez, Jesus Lucero ("Lucero"), and
four other individuals were charged in Count 1 with, from 1986 to
on or about December 9, 1999, conspiracy to distribute more than

---

[1]District Judge of the Eastern District of Louisiana, sitting
by designation.

500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Ismael and Lucero were charged in Count 14 for aiding and abetting each other in the attempt to commit the offense of possession with intent to distribute more than 500 grams of cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 846. Finally, Ismael was charged in Count 16 with, on or about December 9, 1999, knowingly possessing three specified firearms while an unlawful "user" of a controlled substance, in violation of 18 U.S.C. § 922(g)(3).

Ismael was tried by himself and was convicted of the three charged offenses by a jury. In a judgment filed on November 3, 2000, he was sentenced by the district court to imprisonment for 78 months on each count, to be served concurrently, supervised release for four years as to Counts 1 and 14, and three years as to Count 16, to be served concurrently. Ismael now appeals his conviction.


**BACKGROUND**

The Appellant, Ismael Herrera, also known as "Ish," was born in Chihuahua, Mexico, in 1950, and later became a naturalized citizen of the United States. In the early 1990s, Ismael began working as a paralegal in the Odessa, Texas, office of the Herrera Law Firm, operated by his nephew, Jesse Herrera. "Rick" Ignacio Lopez was an undercover agent for Sergeant Valenzuela in Odessa, Texas. Lopez told Valenzuela that he could make drug purchases

2

from "the Herrera family" and that he had knowledge that Octavio Herrera[2] was a cocaine dealer. He had gained this knowledge through multiple interactions with Octavio, including an encounter with Ismael (in which Ismael indicated that he believed Lopez to be a "snitch"). These interactions took place in the early nineties. In 1998, Lopez got reacquainted with Octavio and started "hanging out with him" at Octavio's Gardendale ranch[3] and other places. Late in 1998, Lopez asked Octavio if he could sell him some cocaine. Octavio instead offered to sell Lopez marijuana, apparently stating that "it was easier for him [Octavio] to control the marijuana and that his Uncle Ish would have to get the cocaine." Subsequent to a sale of two pounds of marijuana, Lopez was able to make purchases of cocaine from Octavio.

Over the next several months, from December 1998 to July 1999, Lopez purchased cocaine from Octavio six times. Lopez also made undercover purchases of three or four ounces of cocaine from Jesus Lucero.[4] In conjunction with these undercover operations, the authorities also were intercepting the Herrera family's telephone

---

[2]Octavio Herrera (Jesse Herrera's brother) is Ismael's nephew and Ismael has testified that he knew Octavio to be involved in the sale of narcotics.

[3]The Gardendale ranch was given to Octavio by Ismael in the early nineties and, according to the government, is where many drug sales took place.

[4]Jesus Lucero is also Ismael's nephew who worked with him at the Herrera Law Firm as a "runner." Ismael has also testified that Lucero is a drug dealer.

3

conversations.  In one conversation, intercepted on June 19, 1999, Jesse Herrera instructed Octavio, "You must call Ish to see if he has any Z's."  Sergeant Mario Tinajero of the Texas Department of Public Safety ("DPS") testified that "Z's" is a slang word referring to ounces (short for "oz.'s") and that the conversation was in reference to cocaine.  After this conversation, surveillance revealed that Octavio went to Ismael's residence.  Another conversation, intercepted on June 21, 1999, revealed Ismael telling Octavio, "I'll go with you and we can readily make a deal and we'll park it over here."  Sergeant Tinajero testified that the conversation appeared, from his experience, to be in relation to a drug deal.

Pursuant to these events, an undercover officer, Sergeant Teofilo Garcia, Jr., was introduced to Lucero.  Lopez introduced Garcia as his cousin Thomas from out of town, and Garcia, acting in his undercover capacity, negotiated with Lucero to purchase three ounces of cocaine for $2,100 on July 2, 1999.  This deal was completed and a second negotiation took place at Milo's Restaurant in Odessa.  This time, Garcia asked for one kilogram of cocaine.  Lucero informed Garcia that he could make the sale for $19,000.  Garcia told Lucero that this price was too high, however.

About the same time as the drug negotiations between Garcia and Lucero, separate events were unfolding at the Herrera Law Firm.  Around the beginning of July (Ismael testified that it was

4

approximately ten days before July 11), a person identifying himself as "Lalo" entered the Herrera Law Firm and introduced himself to Ismael using Ismael's drug-dealing brothers Raymond and Manuel as references.[5] Lalo told Ismael that he had a kilogram of cocaine and he sought Ismael's help in distributing it. Ismael claims that he rejected this offer and had nothing more to do with attempting to introduce Lalo to prospective dealers. However, Lucero testified that Ismael gave him Lalo's pager number and informed him that Lalo was in Odessa from Mexico and that he wanted to meet Lucero so that they could make some money.

Lucero paged Lalo and several days later received a call from him. Lalo introduced himself as a friend of Raymond Herrera, and Lucero suggested a meeting at Milo's Restaurant. After speaking with Lalo, Lucero testified that he immediately called Ismael. This conversation was intercepted by authorities. The recording of the conversation revealed that Ismael was not surprised that Lalo called Lucero, and Ismael even reminded Lucero that his name was Lalo. The conversation also revealed that Ismael encouraged Lucero to undertake some sort of endeavor with Lalo, implying but never explicitly mentioning drugs. Ismael also further advised Lucero on how he should proceed. During this conversation, Lucero revealed to Ismael that he had a guy coming over on Tuesday (meaning undercover agent Garcia) and so he should have no problem moving

---

[5]Ismael's brothers, Raymond and Manuel Herrera, both reside in Mexico and are both apparently drug dealers.

the drugs.[6]   In another intercepted telephone call on July 11, 1999, Lucero confirmed that he would meet Lalo at Milo's Restaurant.  Lucero then called Ismael, who instructed Lucero to come to his residence so that he could accompany him to the meeting.  Surveillance officers confirmed that Lucero went by Ismael's and that the two men then went to the restaurant together in Ismael's Toyota Four Runner.  The meeting at Milo's lasted approximately 25 minutes.  Lucero testified that, at the restaurant, Ismael did most of the talking.  Apparently Lalo indicated that he had one kilogram of cocaine available but wanted a partial payment up front of a couple of thousand dollars.  Both Lucero and Ismael indicated that they did not have the money but asked Lalo to "front" them the cocaine because Lucero was "good for it."  Lalo told them he would think about it.  Ismael asserts, however, that he never went along with the intention to make a drug deal, but only to keep Lucero from consummating the deal.

One day later, in another intercepted phone conversation, Lalo told Lucero that he had spent some time with Lucero's uncle (though he never says which uncle, Lucero testified that he believed he meant Ismael), and a second meeting was arranged at the motel where Lalo was staying.  Surveillance revealed that Lucero went to the motel and stayed approximately five minutes.  Lucero testified that he again attempted to have Lalo front the cocaine because he

_____

[6]This and the other taped conversations were all heard by the jury at Ismael's trial.

6

believed that he could sell the whole kilogram to undercover agent Garcia. Lalo backed out, however, and left town without providing any cocaine to Lucero.

On July 13, 1999, Lucero met with undercover agent Garcia again at Milo's Restaurant. Garcia purchased three ounces of cocaine from Lucero and was told by Lucero that he would contact him regarding the sale of one kilogram of cocaine. On July 16, 1999, in another intercepted phone conversation, Lucero spoke to Ismael complaining that Sergio Juarez would not "front" Lucero a kilogram of cocaine. Sergio Juarez was Octavio's and Lucero's supplier of cocaine, and Ismael testified at trial that he knew that Juarez was their supplier. Lucero asked Ismael to help, and Ismael responded that he would see Juarez that coming Sunday at the Gardendale ranch.

Testimony at trial, including Ismael's own testimony, demonstrates that he was a user of cocaine during the last ten years. Ismael asserts, however, that he has not used cocaine since August 1999. In December 1999, Ismael's car was vacuumed and an ion scan revealed trace amounts of cocaine particulates in the car; there is no indication, however, how the particulates got in the car or where in the car the particulates came from. Evidence also showed that Ismael owned at least three firearms, which he possessed for various lengths of time: a .22 caliber derringer, which he had owned for at least two years; a Smith & Wesson .38

caliber revolver, which he had owned for about one year; and .380 Beretta 9mm semi-automatic pistol, which he had owned for four to six months. It was stipulated to at trial that the guns were functional and had traveled in interstate commerce.

## DISCUSSION

Is the evidence sufficient to support the jury's guilty verdict as to Count 1, conspiracy to distribute more than 500 grams of cocaine?

Ismael claims that the evidence presented at trial was insufficient to support his conviction. When reviewing such a claim, this Court considers "the evidence, all reasonable inferences drawn from it and all credibility determinations in the light most favorable to the Government, and affirm[s] if a reasonable jury could find the offense's essential elements beyond a reasonable doubt." *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998). This Court is not to determine whether the jury's decision was correct or not, but rather whether or not the jury's decision was rational. *United States v. Miller*, 146 F.3d 274, 280 (5th Cir. 1998) (citing *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995)). "We recognize that the jury was free to choose among all reasonable constructions of the evidence, and we accept all credibility choices that tend to support the jury's verdict." *Dean*, 59 F.3d at 1484 (citation and quotations omitted). "However, we must reverse a conviction if the evidence construed in favor of

8

the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." *Id.* (quotations omitted).

To establish a conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt: (1) that an agreement existed between two or more persons to violate the applicable narcotics law; (2) that each alleged conspirator knew of the conspiracy and intended to join it; and (3) that each alleged conspirator participated voluntarily in the conspiracy. *Medina*,161 F.3d at 872. The evidence to support a conspiracy conviction need not show an explicit agreement; a tacit agreement is enough. *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997). The government can prove the existence of a conspiracy by circumstantial evidence alone. *Medina*, 161 F.3d at 872. "As long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict." *Westbrook*, 119 F.3d at 1190.

Ismael bases his argument on the fact that he believes that the government failed to meet its burden by showing that he had knowledge of a conspiracy. Ismael contends that the standard above was not met and that the jury could not have come to its decision beyond a reasonable doubt. Many of the cases that are cited by

9

Ismael in which the defendant's conviction was reversed, however, involved cases in which the only evidence against the defendant was that he happened to be in the vicinity of the crime and had associated with the other criminals. *See, e.g., **United States v. Jackson***, 700 F.2d 181, 185 (5th Cir. 1983); ***United States v. DeSimone***, 660 F.2d 532, 537 (5th Cir. 1981). In the present case, the evidence clearly showed that Ismael had many conversations with undertones of a deal that was to be made. He accompanied Lucero to Milo's and took part in discussions regarding "fronting" the cocaine, and his co-conspirator, Lucero, testified that Ismael took part in all of these events with the knowledge that cocaine was involved. Ismael even admits that he went with Lucero to Milo's and that the purpose of Lucero's going there was to consummate a drug deal. Though Ismael argues that he never helped Lucero get in contact with Lalo and that he only went along to disrupt the deal, the jury was free to make a credibility determination as to whom it believed. Obviously the jury was not swayed by Ismael's testimony, and there was ample evidence to support the jury's verdict.

<u>Is the evidence sufficient to support the jury's guilty verdict as to Count 14, attempt to possess more than 500 grams of cocaine with intent to distribute?</u>

The standard of review articulated above for a sufficiency of the evidence claim is the same standard used here. "To be convicted of attempt under 21 U.S.C. § 846, a defendant 'must have been acting with the kind of culpability otherwise required for the

10

commission of the crime which he is charged with attempting,' and 'must have engaged in conduct which constitutes a substantial step toward commission of the crime' i.e., conduct 'strongly corroborative of the firmness of the defendant's criminal intent.'" *United States v. Stone*, 960 F.2d 426, 433 (5th Cir. 1992) (quoting *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974)). The crux of Ismael's argument is that no substantial step was taken toward the commission of the crime. Ismael contends this is evidenced by the fact that no money ever changed hands between Ismael, Lucero and Lalo and no drugs were ever received. This, of course ignores the fact that the duo were attempting to get Lalo to "front" them the cocaine, which would not require any money. It also ignores the fact that had the conversation with Lalo "bor[n] fruit," the charge would not be attempt to possess with intent to distribute but actual possession with intent to distribute. The evidence before the jury was therefore sufficient to support the verdict.

<u>Did a fatal variance exist between the conspiracy alleged in the indictment (Count 1) and the proof offered at trial?</u>

To prevail on a material variance claim, a defendant must prove (1) a variance between the indictment and the proof at trial, and (2) that the variance affected the defendant's substantial rights. *United States v. Morrow*, 177 F.3d 272, 291 (5th Cir. 1999)(citing *United States v. Morgan*, 117 F.3d 849, 858 (5th Cir. 1997)). "Whether the evidence shows one or multiple conspiracies

11

is a question of fact for the jury." *Id.* When counting the number of conspiracies, this Court will consider (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings. *Morgan*, 117 F.3d at 858. This Court will affirm the jury's finding that the Government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the Government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt. *Id.* "A reversal based on variance between the indictment and proof requires two findings: (1) that the trial evidence actually proved multiple conspiracies, and (2) that the variance affected a substantial right of the appellant." *United States v. Sharpe*, 193 F.3d 852, 866 (5th Cir. 1999) (citing *United States v. Franklin*, 148 F.3d 451, 459 (5th Cir. 1998)). Even if multiple conspiracies are proven at trial, however, if an indictment alleges a single conspiracy count, and the government proves the defendant's involvement in at least one of them, then there is no variance affecting the defendant's substantial rights. *Medina*, 161 F.3d at 872.

Ismael argues that the evidence is insufficient to prove a conspiracy, and that the proof offered at trial was to multiple conspiracies.[7] As stated above, however, there was ample evidence

---

[7]Though Ismael's argument is not clear on this point, the cases cited by Ismael all reference multiple conspiracies.

to support the jury's verdict.  Furthermore, even if the government did prove the existence of multiple conspiracies, it also proved Ismael's involvement in at least one of them, i.e. the attempted drug deal with Lalo and Lucero at Milo's restaurant.  Ismael, therefore, can not show that his substantial rights were affected.

<u>Is the evidence sufficient to support the jury's guilty verdict as to Count 16, use of a controlled substance and possession of a firearm on or about December 9, 1999?</u>

Finally, Ismael asserts that the evidence was insufficient to support a guilty verdict as to Count 16 of his indictment alleging possession of a firearm while being an unlawful user or addict of controlled substances in violation of 18 U.S.C. § 922(g)(3).  The standard of review articulated above for a sufficiency of the evidence claim is the same standard used here.  Section 922(g)(3) states:

> It shall be unlawful for any person-
> ....
>> (3) who **is an unlawful user of or addicted to** any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));
> ....
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g) (emphasis added).  Count 16 of the indictment states:

> That on or about December 9, 1999, in the Western District of Texas, the Defendant, who is an unlawful user of and addicted to a controlled

13

> substance, did knowingly possess in and affecting commerce firearms, to wit: a Smith & Wesson .38 caliber revolver; a Beretta 9mm semi-automatic pistol; and a Davis .22 caliber derringer, which had been shipped and transported in interstate commerce.

The jury charge, as to this count, stated, in pertinent part, that to find Ismael guilty of the offense, the jury had to be convinced beyond a reasonable doubt:

> That the defendant was an unlawful user of or addicted to a controlled substance, as charged. The jury must unanimously agree as to one or the other, user or addict, or both, if the jury believes the government has met its burden.
>
> ....
>
> The time period involved in this count is a time period in reasonable proximity to December 9, 1999. An addict is defined as any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction.
>
> The term "user" is defined in accordance with its common and ordinary meaning.

Ismael argues that the government presented absolutely no evidence at trial that Ismael is an addict. Ismael further avers that no evidence was presented indicating that Ismael had used drugs after August of 1999, and that it therefore failed to establish that he had used drugs and possessed a firearm in a close proximity to the time period alleged, i.e. December 9, 1999.

Before turning to the sufficiency of the evidence, however, because the government and Herrera disagree as to what is required

14

by the statute, we must determine what meaning the phrase "is an unlawful user of or addicted to any controlled substance" should be given. In questions of statutory interpretation, we look to the text, structure, and legislative history of the provision in question, as well as to the determinations made by our sister circuits. *Stucky v. City of San Antonio*, 260 F.3d 424, 440 (5th Cir. 2001). Very few cases have dealt specifically with interpreting 18 U.S.C. § 922(g)(3). In *United States v. Edwards*, 182 F.3d 333 (5th Cir. 1999), this Court was faced with a vagueness challenge to § 922(g)(3). At the outset, this Court noted that vagueness challenges that do not implicate First Amendment freedoms are reviewed only in light of the facts of the case at hand. *Id.* at 335. The Court then determined that, because the defendant was found with marijuana and cocaine at his residence on the same night they found a gun on the defendant, and due to the defendant's own admission that he smoked marijuana on a daily basis, the statute was not vague as applied and the conviction would stand. *Id.* at 336. The Court in *Edwards* did not attempt to define the statute more precisely, however, possibly because the defendant's status as an "unlawful user" or "addict" was without question. Other cases involving the sufficiency of the evidence have similarly upheld convictions when the circumstances made it clear that the defendant was an "unlawful user" or "addict," but these cases never attempted to define the terms of the statute. *See, e.g., United States v.*

15

*Jackson*, 280 F.3d 403, 406 (4th Cir. 2002) (noting that, while the "exact reach of the statute is not easy to define . . . this is not a borderline case"); *United States v. McIntosh*, 23 F.3d 1454, 1458-59 (8th Cir. 1994) (upholding conviction when defendant had admitted to addiction and also had controlled substances on him when arrested with firearm). These cases have, however, narrowed the statute's scope somewhat, requiring that the government prove a defendant was an "unlawful user" or addicted to a controlled substance during the time he possessed firearms. *McIntosh*, 23 F.3d at 1458. There are also some courts that have distinguished between present and past drug use, but those cases may have been in the context that the drug use occurred before gun possession. In *United States v. Reed*, 114 F.3d 1067 (10th Cir. 1997), the Tenth Circuit seemed to implicitly acknowledge that 922(g)(3) prohibits possession of a weapon by one who "is" a user, not one who "was" a user. *Id.* at 1069. Ultimately, however, the court concluded that the district court's decision to dismiss based on vagueness was premature and remanded the case. *Id.* at 1071. More recently, the Ninth Circuit stated that infrequent drug use from the distant past could present a vagueness challenge to the "unlawful user" language. *United States v. Purdy*, 264 F.3d 809, 812 (9th Cir. 2001) (citing *United States v. Ocegueda*, 564 F.2d 1363, 1366 (9th Cir. 1977) which was based on 922(g)(3)'s predecessor statute of 18 U.S.C. § 922(h)(3)). The conviction in that case was also upheld

16

in light of evidence revealing the defendant's drug use just two days prior to a gun's seizure in his home as well as testimony indicating his continued drug use. *Id.* at 810-11. The court did state, however, that "to sustain a conviction under § 922(g)(3), the government must prove--as it did here--that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm." *Id.* at 812-13. This does not mean that § 922(g)(3) requires that the defendant possess a firearm while unlawfully using a controlled substance, but only that the defendant is an unlawful user. *Jackson*, 280 F.3d at 406. A review of the relevant case law provides little further guidance on this issue than that provided by *Purdy* and *Jackson*.

Having found little guidance in the relevant case law, we are forced to look to the terms' ordinary meanings. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). The term "is" is the present third-person singular form of the word "be" or "to be." Webster's Third New World Dictionary 1197 (1971). The term "unlawful" is defined by Black's Law Dictionary as an adjective meaning: 1) Not authorized by law; illegal; 2) Criminally punishable; 3) Involving moral turpitude. Other texts define the term "unlawful" similarly. No federal statute specifically makes it illegal, however, to be a

17

"user" of drugs, though possession, distribution and transportation are all made illegal.[8] *See generally* 21 U.S.C. §§ 801 - 971 (covering drug abuse prevention and control). Likewise, no statutes in the state of Texas, the state Herrera was convicted in, criminalize the status of being a "user." It may well be that neither Congress nor the states can make the status of being a "user," by itself, illegal in light of Supreme Court precedent.[9] ***Robinson v. State of Calif.***, 370 U.S. 660 (1962). Therefore, the only definition of "unlawful" that might be applicable is the third of "involving moral turpitude." A "user" is defined as "one that

---

[8]Section 801 of Title 21 seems to indicate this by stating:
> The illegal importation, manufacture, distribution, and possession **and improper use** of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

21 U.S.C. § 801 (2) (emphasis added). Section 801 does not mention the *illegal* use of controlled substances, only the *improper* use of controlled substances.

[9]In ***United States v. Robinson***, 370 U.S. 660 (1962), the Supreme Court reviewed a California statute that criminalized the status of being an addict. *Id*. at 660-61. Writing for the Court, Justice Stewart, in referring to the treatment of addicts stated:
> The impact that an addict has on a community causes alarm and often leads to punitive measures. Those measures are often justified when they relate to acts of transgression. But I do not see how under our system being an addict can be punished as a crime. If addicts can be punished for their addiction, then the insane also can be punished for their insanity.

*Id.* at 674. The Court concluded that because the statute was aimed at penalizing a sickness rather than at providing medical care for it, it could not withstand a challenge under the Eight Amendment. *Id.* at 678.

uses; *specif.*: a person who uses alcoholic beverages or narcotics."[10] Webster's Third New World Dictionary 2524 (1971). Finally, an addict is defined by the Controlled Substances Act as being "any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction."[11] 21 U.S.C. § 802 (1).

The case law and the common and ordinary meaning of the terms used in the statute, therefore, still give us little guidance. From **Purdy** and the common use of the word "is," it seems clear that the statute requires a contemporaneous possession of firearms with the status of being an "unlawful user" or "addict" of controlled substances. The term "addict" is adequately defined in the Controlled Substances Act so as to give clear guidance as to the meaning of that term. The words "unlawful user" are not as clear. The common and ordinary use of the word "user" would seem to mean anyone who uses narcotics. Had Congress chosen to insert only that word, then the outcome of this exercise in statutory construction might end right there. Congress chose to modify the word "user"

---

[10]At trial, the government suggested giving the term "user" its common and ordinary meaning. The trial court appears to have adopted the government's suggestion.

[11]This was the definition for "addict" that the trial court chose to use in its jury charge.

19

with the word "unlawful," however, and so we must examine what is an "unlawful user."  As stated above, being a "user" is not by itself illegal under any federal or state statute.  Congress could not have used the words "unlawful user" to refer to conduct prohibited by statute.  We turn therefore to the legislative history of § 922 for guidance.  "Where, as here, the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Toibb v. Radloff*, 501 U.S. 157, 162 (1991) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 (1984)).

Section 922's predecessor was passed in 1968, but originally did not contain any provision regarding drug use.  S. Rep. No. 1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2205 (prohibiting felons, fugitives, or those under indictment from shipping or receiving firearms in § 922(e) and (f)).  The "Purpose of Amendment" section of the Senate Report stated that the purpose of the act was to "aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Id.* at 2213; *see also* *Huddleston v. United States*, 415 U.S. 814, 824 (1974).  Later that same year, the House amended § 922 by adding 922(g).  Gun Control Act of 1968, Pub.L. 90-618.  The "Section-by-Section Analysis" of the House Report stated:

20

> This subsection originally made it unlawful for a felon, fugitive, or one under indictment to receive a firearm or ammunition which has been shipped or transported in interstate or foreign commerce. Under a committee amendment anyone who is an unlawful user of or addicted to marihuana, any depressant or stimulant drug (as defined in sec. 201(v) of the Federal Food, Drug and Cosmetic Act), or a narcotic drug (as defined in sec. 4731(a) of the Internal Revenue Code of 1954); or has been adjudicated in any court as a mental defective or has been committed under a court order to any mental institution, also would be prohibited from receiving a firearm or ammunition shipped in interstate or foreign commerce.

H.R. Rep. No. 1577 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4421. The Supreme Court has stated that "Congress' intent in enacting §§ 922(g) and (h) . . . was to keep firearms out of the hands of presumptively risky people." ***Dickerson v. New Banner Instit., Inc.***, 460 U.S. 103, 113 n.6 (1983). The Court also stated that "Congress sought to rule broadly -- to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." ***Id.*** at 112 (internal quotations and citations omitted). More recently, the Second Circuit noted that the purpose of the Gun Control Act was to prohibit the ownership of firearms by "mentally unstable" or "irresponsible" persons. ***United States v. Waters***, 23 F.3d 29, 35 (2d Cir. 1994). These general statements, however, add little to the purposes stated by Congress other than a concern for keeping guns out of the hands of dangerous individuals. As this Court can find no more information as to why § 922(g)(3) was enacted, we are

21

left only with the vague statement in the Senate Report that Congress intended to keep guns out of the hands of those who have criminal backgrounds, are incompetent or are too young. These were stated purposes for the entire section, however, and not just the section pertaining to drug use.

When, after seizing everything from which aid can be derived, the statute remains ambiguous, the rule of lenity may be applied. *Smith*, 508 U.S. at 239 (citing *United States v. Bass*, 404 U.S. 336, 347 (1971)); *Rewis v. United States*, 401 U.S. 808, 812 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). "If uncertainty remains after our interpretation of the text and its underlying policies, the rule of lenity requires a narrow construction of the law." *United States v. Prestenbach*, 230 F.3d 780, 784 n.23 (5th Cir. 2000); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 284-285 (1978) ("[W]here there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant."). Though this Court reserves lenity only for those situations in which "a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute," *Moskal v. United States*, 498 U.S. 103, 108 (1990) (quotations omitted), we believe that this is just such an occasion.

Giving the term a narrow construction, we hold that an "unlawful user" is one who uses narcotics so frequently and in such quantities as to lose the power of self control and thereby pose a danger to the public morals, health, safety, or welfare. In other words, an "unlawful user" is someone whose use of narcotics falls just short of addiction, as that term is defined by the Controlled Substances Act. This reading of the term is consistent with the language of the legislative history as well as holdings of our sister circuits.[12] *See, e.g.* **Purdy**, 264 F.3d at 812; **Jackson**, 280 F.3d at 406.

Having thoroughly analyzed § 922(g)(3) and its meaning, we turn to the evidence presented to the jury to determine if there existed sufficient evidence on which to convict Ismael Herrera on Count 16.

Initially, we note that, despite language in the indictment, the government has not argued that the evidence in this case would support a jury finding that Herrera was "addicted to" any controlled substance at any time contemporaneously with his possession of a firearm. Upon review of the evidence we find that if the government had made such an argument, it would have been tenuous at best. We review the evidence, therefore, to test its sufficiency as to Herrera's being an "unlawful user," viewing such

---

[12]Indeed, the government itself conceded at oral argument that to be prosecuted under § 922(g)(3), the drug use would have to be with regularity and over an extended period of time.

23

evidence in a light most favorable to the jury verdict.  At trial, Ismael testified that he began using marijuana after he returned from the Vietnam War.  Ismael also admitted to using cocaine during the past ten years and also to possessing firearms in an overlapping time period over the past two years.  Therefore, there is no question that Ismael was a user of drugs while he possessed firearms.  But as we stated above, it is not his status as a user that must be established but his status as an "unlawful user."

At trial, Jesus Lucero testified to the following: that he saw Ismael use cocaine about twice a month; that Lucero would give small amounts of cocaine to Ismael on occasion; that Ismael did not use cocaine while at work; that Ismael used cocaine pretty consistently up until he got arrested; that Ismael attempted to quit using cocaine in August of 1999; that Ismael was unsuccessful in this attempt to quit; that Lucero had not done cocaine with Ismael since March of 1999; that Lucero had seen a gun in Ismael's car before, and; that Lucero had only seen Ismael use small amounts of cocaine at his house or at parties.  Aaron Herrera testified: that he had seen Ismael use cocaine on a very few occasions at parties at Jesse Herrera's house; that Ismael had asked Aaron for cocaine at work before; that though Aaron had not seen Ismael use cocaine at work, he suspected he had used it at work; that in the two-and-a-half years that he worked with Ismael, he had used

24

cocaine with him approximately three times, and; that he had seen a gun in Ismael's briefcase at work before.

Rick Aranda testified: that since he had started working with Ismael in 1993, he had seen Ismael use cocaine once or twice at work; that he had given Ismael cocaine at work at Ismael's request; that he had only seen Ismael use cocaine a total of two to four times; that Jesse Herrera held parties approximately once a month and that cocaine was used at these parties; that Ismael rarely attended these parties; that about once every two weeks Ismael would ask Aranda for cocaine; that he had been fired from the Herrera Law Firm in November of 1998 and had not seen Ismael since that time; that he had seen Ismael in possession of a firearm in 1993, and; that he believed Ismael was successful in his attempts to quit using cocaine. Ismael Herrera testified: that he was an occasional user of cocaine; that he mainly used cocaine on Fridays and Saturdays and occasionally during the week but not every week or weekend; that he would sometimes go a month or two without using cocaine; that he had not used cocaine since August of 1999 when his sister died; that he had owned a derringer for two years, a .38 for one year, and a .380 Beretta for three or four months; that he possessed these guns during a time period that he was using cocaine; that he had a firearm in his briefcase at work; that he had used cocaine at work; that in 1998, he would sometimes use as much as one gram of cocaine every two or three weeks, and; that in

25

1999, previous to quitting, he would sometimes use as much as one gram a week. The only other evidence presented to the jury as to Ismael's drug use was the cocaine particulates found from the ion scan of the vacuumed contents of his car.

No testimony presented at trial indicates that Ismael posed a danger to others with respect to his cocaine use or that Ismael was a dangerous individual because of his use.[13] The government presented no evidence that Ismael's use of cocaine caused him to lose the power of self control and thereby pose a danger to the public morals, health, safety, or welfare. At most, the evidence can only establish that Ismael was a user of small amounts of cocaine prior to August of 1999, with his frequency of use varying from using every week to sometimes not at all for months at a time. Though this Court does not condone his behavior, Ismael's use can not be said to rise to the level of being an "unlawful user" as we have determined that Congress intended such term to mean. We therefore conclude that the jury was presented with insufficient evidence on which to convict Ismael Herrera of Count 16. As we hold that the evidence is insufficient to establish that Ismael was an "unlawful user," we need not delve into whether or not the

---

[13]As we have already noted, Congress' intention was to keep guns out of the hands of dangerous or incompetent individuals, but the mere possession of firearms by a user of narcotics does not automatically make that individual dangerous or incompetent. An individual's regular use of narcotics over an extended period of time must first pose a danger to the public morals, health, safety and welfare before his possession of firearms is prohibited.

government failed to establish that he had used drugs and possessed a firearm in a close proximity to the time period alleged in the indictment.

### CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing and for the reasons set forth above, we conclude that the jury was presented with sufficient evidence on which to convict Ismael Herrera on Counts 1 and 14 and that no fatal variance existed as to Count 1. As to Count 16, we hold that there was insufficient evidence to convict Ismael Herrera because the evidence presented to the jury failed to establish that he was an "unlawful user." We therefore AFFIRM Ismael's conviction as to Count 1 and 14 but REVERSE as to Count 16.

**AFFIRMED IN PART,** and **REVERSED IN PART.**

27

DUPLANTIER, District Judge, dissenting in part:

I concur in the majority opinion, except with respect to the reversal of defendant's conviction on Count 16. That count charges defendant with knowingly possessing firearms while he was an "unlawful user of and addicted to" a controlled substance, in violation of 18 U.S.C. §922(g)(3). I disagree with the majority's conclusion that the phrase "unlawful user" renders the statute ambiguous, thereby warranting the application of the rule of lenity, and mandating a narrow construction of the phrase.

Citing defendant's own testimony, the majority states that "Ismael was a user of drugs while he possessed firearms," but concludes that he was not an "unlawful user." Clearly, defendant's use of drugs was not a lawful use. One who "uses" a controlled substance must necessarily also "possess" that controlled substance. Title 21 U.S.C. §844 makes it "unlawful for any person knowingly or intentionally to possess a controlled substance" except under circumstances not relevant here. Thus, any person who unlawfully possesses a controlled substance and uses that substance is an "unlawful user" within the meaning of the statute at issue. Congress apparently concluded that any individual who unlawfully uses a controlled substance should not contemporaneously possess a firearm, because such a user could well have impaired judgment and pose a threat to society. This is equally true of a first-time user as it is of one who uses drugs

28

frequently. In the statute Congress modified "user" by the adjective "unlawful," so as not to include persons who lawfully use drugs, e.g. by a physician's prescription.

Based on defendant's own testimony, there is sufficient evidence to support the jury's finding that defendant knowingly possessed firearms while he was an "unlawful user" of a controlled substance. The only remaining issue is whether there is sufficient evidence to conclude that defendant unlawfully used drugs and possessed a firearm in close proximity to the date alleged in the indictment, i.e., "on or about December 9, 1999."

The government need not prove the exact date on which the defendant violated the statute. "It is well established in this Circuit that the alleged time of the offense is not an essential element of the offense charged in the indictment." *United States v. Powers*, 168 F.3d 741, 746 (5th Cir. (1999). "It is sufficient if the evidence demonstrates a date reasonably near the date alleged in the indictment." *United States v. Bowman*, 783 F.2d 1192, 1197 (5th Cir. 1986). "[W]ithin reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient." *United States v. Lokey*, 945 F.2d 825, 832 (5th Cir. 1991) (internal citation and quotation omitted). There is sufficient evidence to support a conclusion that defendant possessed firearms while he unlawfully used a controlled substance within several months of the date charged in the indictment, a time

29

period "reasonably near" the date alleged in the indictment. *See United States v. Bowman,* 783 F.2d 1192, 1197 (5th Cir. 1986)(nine month variance between mailing date alleged in indictment and date to which witness testified at trial not fatal).

I would affirm defendant's conviction on Count 16.

DUPLANTIER, District Judge, dissenting in part:

I concur in the majority opinion, except with respect to the reversal of defendant's conviction on Count 16. That count charges defendant with knowingly possessing firearms while he was an "unlawful user of and addicted to" a controlled substance, in violation of 18 U.S.C. §922(g)(3). I disagree with the majority's conclusion that the phrase "unlawful user" renders the statute ambiguous, thereby warranting the application of the rule of lenity, and mandating a narrow construction of the phrase.

Citing defendant's own testimony, the majority states that "Ismael was a user of drugs while he possessed firearms," but concludes that he was not an "unlawful user." Clearly, defendant's use of drugs was not a lawful use. One who "uses" a controlled substance must necessarily also "possess" that controlled substance. Title 21 U.S.C. §844 makes it "unlawful for any person knowingly or intentionally to possess a controlled substance" except under circumstances not relevant here. Thus, any person who unlawfully possesses a controlled substance and uses that substance is an "unlawful user" within the meaning of the statute at issue. Congress apparently concluded that any individual who unlawfully uses a controlled substance should not contemporaneously possess a firearm, because such a user could well have impaired judgment and pose a threat to society. This is equally true of a first-time user as it is of one who uses drugs

31

frequently.  In the statute Congress modified "user" by the adjective "unlawful," so as not to include persons who lawfully use drugs, e.g. by a physician's prescription.

Based on defendant's own testimony, there is sufficient evidence to support the jury's finding that defendant knowingly possessed firearms while he was an "unlawful user" of a controlled substance. The only remaining issue is whether there is sufficient evidence to conclude that defendant unlawfully used drugs and possessed a firearm in close proximity to the date alleged in the indictment, i.e., "on or about December 9, 1999."

The government need not prove the exact date on which the defendant violated the statute.  "It is well established in this Circuit that the alleged time of the offense is not an essential element of the offense charged in the indictment." *United States v. Powers*, 168 F.3d 741, 746 (5th Cir. (1999).  "It is sufficient if the evidence demonstrates a date reasonably near the date alleged in the indictment." *United States v. Bowman*, 783 F.2d 1192, 1197 (5th Cir. 1986).  "[W]ithin reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient." *United States v. Lokey*, 945 F.2d 825, 832 (5th Cir. 1991) (internal citation and quotation omitted). There is sufficient evidence to support a conclusion that defendant possessed firearms while he unlawfully used a controlled substance within several months of the date charged in the indictment, a time

32

period "reasonably near" the date alleged in the indictment.  *See United States v. Bowman,* 783 F.2d 1192, 1197 (5th Cir. 1986)(nine month variance between mailing date alleged in indictment and date to which witness testified at trial not fatal).

I would affirm defendant's conviction on Count 16.